**Claude CASSIRER, Plaintiff,**

v.

**KINGDOM OF SPAIN,**
et al., Defendants.

No. CV 05–3459–GAF(CTX).

United States District Court,
C.D. California.

Aug. 30, 2006.

Andrew R. Hall, Davis Wright and Tremaine, Los Angeles, CA, Catherine E. Maxson, John A. Reed, Stuart R. Dunwoody, Davis Wright and Tremaine, Seattle, WA, Victor A. Kovner, Davis Wright and Tremaine, New York, NY, for Plaintiff.

Mark E. Beck, Mark Mermelstein, Beck De Corso Daly Kreindler & Harris, Andrew J. Fleming, Michelle Beth Goodman, Thaddeus J. Stauber, Sidley Austin, Los Angeles, CA, William M. Barron, Alston & Bird, New York, NY, for Defendants.

## MEMORANDUM AND ORDER REGARDING DEFENDANTS' MOTIONS TO DISMISS

FEESS, District Judge.

## I.

## INTRODUCTION & BACKGROUND

### A. THE LAWSUIT

In the present lawsuit, Plaintiff, the grandson of Lilly Cassirer Neubauer, seeks to recover from the Kingdom of Spain ("Spain") and the Thyssen–Bornemisza Collection Foundation (the "Foundation"), a painting by Camille Pissaro (the "Painting") that the Nazis extorted from his grandmother in 1939 as a condition to issuing her an exit visa. After World War II, the painting changed hands several times, ultimately ending up in the hands of Baron Thyssen–Bornemisza, one of the world's foremost art collectors. In 1988, when the Baron loaned his collection, including the Painting, to Spain under contract, Spain spent millions of dollars to refurbish a state-owned palace, the Villahermosa, and provided it at no charge as the home for the Thyssen–Bornemisza Museum (the "Museum") where the collection was displayed. (Compl. ¶¶ 29–30). Spain paid the Baron $50 million for a ten-year lease of the collection, but in 1993 paid an additional $327 million to enable the Foundation to purchase the entire collection. (Id.).

Plaintiff claims that he first learned in 2000 that the Foundation was in possession of the Painting, which he contends was the first information he had regarding its whereabouts since it was taken in 1939. (Id. ¶ 31). In 2001, he petitioned Spain's then Minister of Education, Culture and Sports, Pilar del Castillo Vera, for the Painting's return. Plaintiff's request was refused. (Id. ¶ 32). In July 2003, five United States Congressmen wrote to Minister del Castillo Vera requesting that Spain and the Foundation return the Painting to Cassirer, its rightful owner. (Id. ¶ 33). When del Castillo Vera again refused, Plaintiff filed suit in this Court seeking recovery of the Painting and a variety of other remedies. Plaintiff has never attempted to obtain the Painting through judicial proceedings initiated in Spain.

### B. THE MOTIONS TO DISMISS

Defendants now move under Fed. R.Civ.P. ("Rule") 12(b) to dismiss this lawsuit on various procedural grounds. They contend: (1) on the basis of the Foreign Sovereign Immunity Act ("FSIA"), 28 U.S.C. §§ 1602, et seq., that this Court lacks subject matter jurisdiction over the

dispute; (2) under *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), and its progeny, that this Court lacks personal jurisdiction over Defendants; and (3) that the Central District of California is not the proper venue for the lawsuit. Spain also moves under Rule 12(b)(6) for dismissal for failure to state a claim. The parties have submitted detailed memoranda and a substantial volume of evidence in support of and in opposition to each of Defendants' motions, which the Court has read and considered. In the interests of brevity and expedition, the Court will confine itself to a relatively brief discussion of the issues and their resolution, since all parties have clearly indicated that those on the losing side wish to present these issues to the Ninth Circuit Court of Appeals as soon as possible. In that regard, the Court is persuaded that this "order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). Therefore, the Court hereby **CERTIFIES** this matter for interlocutory appeal.

### C. THE ISSUE PRESENTED

Although Defendants raise a number of questions subsidiary to the principal issue before the Court, the fundamental question for resolution is whether this Court may properly assert jurisdiction over the present dispute under the "expropriation" or "takings" exception to the FSIA for cases involving property expropriated in violation of international law. 28 U.S.C. § 1605(a)(3).

## II.

## DISCUSSION

Sovereigns are ordinarily immune from suit in the United States, 28 U.S.C. § 1604, unless the lawsuit against them falls into one of the statutorily created exceptions to sovereign immunity. Here, Plaintiff contends that this Court has subject matter jurisdiction on the basis of the exception established in 28 U.S.C. § 1605(a)(3), which provides in relevant part that a foreign state *or* its instrumentality is not immune from suit in any case

> in which rights in property taken in violation of international law are in issue and . . . *that property* or any property exchanged for such property *is owned or operated by an agency or instrumentality of the foreign state and* that agency or instrumentality is *engaged in a commercial activity in the United States.*

28 U.S.C. § 1605(a)(3) (emphases added); 28 U.S.C. § 1603(a) (defining "foreign state" to include its agency or instrumentality). Several preliminary issues must be addressed before the Court comes to the principal issue to be decided. These are (1) does this lawsuit present a case or controversy within the meaning of Article III of the United States Constitution; (2) is the Foundation an agency or instrumentality of Spain; (3) must Plaintiff exhaust judicial remedies in the courts of the foreign state in possession of the property as a condition to pursuing his claim in this Court; (4) was the Painting taken by a "sovereign;" and (5) was the Painting taken from a citizen of the expropriating state such that the expropriation exception does not apply.

### A. THE PRELIMINARY ISSUES

#### 1. CASE OR CONTROVERSY

■ Citing to *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), Spain contends that the current

dispute does not present a "case or controversy" and therefore fails to meet the minimum requirement of Article III for the exercise of federal jurisdiction because Spain did not cause Plaintiff any injury that is "fairly traceable" to its actions, and a judgment will not redress Plaintiff's injury. *See Bennett v. Spear*, 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). But this argument begs the question of whether this Court may properly entertain an action to force Spain to disgorge the painting even though Spain was not involved in the illegal expropriation. On that subject, the Court has already been presented with and decided the issue of whether the phrase "taken in violation of international law" limited the Court's exercise of jurisdiction to sovereigns that had been involved in the initial taking. The Court concluded that the language of the statute contains no such limitation, and the logic of the few decisions that have decided the question teaches that no such limitation should be implied. (*See generally* Order Granting Mot. for Jurisdictional Discovery, Apr. 27, 2006).

Moreover, Defendants have not disputed that del Castillo Vera was presented with and denied Cassirer's requests that Spain return the Painting to him, (Compl.¶¶ 32–33), which creates a factual dispute as to whether Cassirer or the Foundation owns the Painting. (8/14/06 Hearing Tr. at 38–39). Thus, whether or not Cassirer can ultimately establish an interest in the Painting, whether he can establish that his interest is superior to that of Spain and the Foundation, and whether he can establish a legal basis for vindicating that interest are all matters that must be left for another day. But the fact that such issues must be resolved tends to prove, rather than disprove, the existence of a case or controversy in the present circumstances. Accordingly, under the statute as construed by this Court, a case or controversy

arising under federal law is presented and Article III does not preclude the Court from exercising jurisdiction over the case.

## 2. AGENCY OR INSTRUMENTALITY

■ The FSIA defines an "agency or instrumentality" of a foreign state as follows:

(b) An "agency or instrumentality of a foreign state" means any entity—

(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

(3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b). An "agency or instrumentality" of the foreign sovereign, as distinct from the sovereign itself, engages in "core functions" that are predominantly commercial rather than governmental. *See Garb v. Republic of Poland*, 440 F.3d 579, 591 (2d Cir.2006) (citing *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 151 (D.C.Cir.1994) ("[I]mmunity is confined to suits involving the foreign sovereign's public acts, and does not extend to cases arising out of a foreign state's strictly commercial acts.") (citations and quotation marks omitted)).

Spain half-heartedly argues that the Foundation is not an agency or instrumentality of the Spanish government, but even the Foundation disagrees. (*See* Foundation Mot. at 3). Here the Court is presented with unrebutted allegations that (1) Spain arranged and was a party to the contract for the original loan of the collec-

tion that included the Painting and Spain paid the $50 million lease price for the Thyssen–Bornemisza collection; (2) Spain later paid the $327 million to fund the purchase of the Baron's entire collection; (3) Spain provided the facility, the Villahermosa palace, to be used as the Museum to house the collection; (4) Spain paid the cost of refurbishing that facility; (5) two-thirds of the Foundation's directors "must" be representatives of Spain, appointed by the Spanish government and freely removable through royal decree; and (6) many of Spain's governmental ministers serve as directors on the Foundation's board. (Compl.¶¶ 9(a)-(d), 29–30). The Court therefore concludes that the property in dispute is owned by an agency or instrumentality of Spain.

### 3. EXHAUSTION OF JUDICIAL REMEDIES

Defendants argue that, to take advantage of the FSIA exception to immunity, Plaintiff must exhaust his judicial remedies in the foreign state where the property is located. Spain relies heavily on a comment made by Justice Breyer in a concurring opinion in *Republic of Austria v. Altmann*, 541 U.S. 677, 714, 124 S.Ct. 2240, 159 L.Ed.2d 1 (2004), regarding the possibility that an exhaustion requirement "may" exist. However, the majority decision, which states the rule in the case, includes no holding that the statute requires exhaustion.

Of greater importance on this issue is the plain language of Section 1605(a)(3), which contains no exhaustion-of-foreign-remedies requirement. In fact, FSIA's Section 1605(a)(7)(B)(*l*), which incorporates a requirement that any claim thereunder first be pursued through arbitration before that exception applies, strongly suggests that the absence of a similar exhaustion requirement in the expropriation exception reflects the intent of Congress *not*

to include an exhaustion requirement in Section 1605(a)(3). *See Sundance Land Corp. v. Cmty. First Fed. Sav. & Loan Ass'n*, 840 F.2d 653, 663 (9th Cir.1988) ("Where Congress has carefully employed a term in one place and excluded it in another, it should not be implied where excluded."). The Court therefore concludes that an exhaustion requirement should not be implied where Congress created no such obligation as a condition to the exercise of subject matter jurisdiction under the expropriation exception to sovereign immunity.

### 4. TAKING BY A SOVEREIGN

The last two threshold issues more narrowly address the "taken in violation of international law" element of the FSIA expropriation exception.

Spain contends that since a Munich art dealer named Jakob Scheidwimmer was the one who allegedly demanded the Painting from Lilly Cassirer (the original owner), and Scheidwimmer was *not* an agent of the German government, that a "sovereign" did not take the Painting. (Spain Mot. at 11–12). The Court disagrees. While Spain is correct that "[t]he term 'taken' ... clearly refers to acts of a sovereign, not a private enterprise, that deprive a plaintiff of property without adequate compensation," *Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 251 (2d Cir.2000), here, however, Plaintiff has both alleged that Scheidwimmer was an agent of the controlling Nazi party, (Compl.¶ 23), and provided compelling expert evidence to that effect, (Petropoulos Decl., Ex. B [Expert Opinion Report] (Scheidwimmer was a "member of the Nazi Party, implemented state policies and can be viewed as an agent of the state")). *See Altmann*, 541 U.S. at 697, 124 S.Ct. 2240 ("A Nazi lawyer ... took

possession of the six Klimts.").[1] Moreover, Defendants have not argued that the approximate $360 at 1939 exchange rates constituted just compensation, especially when, as Plaintiffs allege and Defendants have not refuted, Ms. Cassirer would never be permitted to withdraw the funds since they were paid into a blocked bank account. (Compl.¶ 23). Apparently unable to rebut this evidence, Spain contends that this evidence is improperly beyond the scope of the pleadings. (Spain Reply at 7). However, since the Court granted jurisdictional discovery to resolve issues such as these, the evidence may properly be considered for purposes of determining FSIA jurisdiction. *Adler v. Fed. Republic of Nig.*, 107 F.3d 720, 728 (9th Cir.1997) ("A district court may properly look beyond the complaint's jurisdictional allegations and view whatever evidence has been submitted to determine whether in fact subject matter jurisdiction exists.") (citations and quotation marks omitted); *Malewicz v. City of Amsterdam*, 362 F.Supp.2d 298, 305–06 (D.D.C.2005) ("[T]he court must look beyond the parties' pleadings to resolve any factual disputes that are essential to its decision to retain jurisdiction or dismiss the action."). In any event, either based on a review of the evidence or strictly viewing the unrebutted allegation in the Complaint, Scheidwimmer can be considered as an agent of the Nazi German regime and the Court concludes that the taking of Ms. Cassirer's Painting was indeed by a sovereign.

### 5. TAKING FROM A NON-CITIZEN

■ Finally, Spain contends that even if Scheidwimmer was an agent of Germany in taking the Painting, the taking was not "in violation of international law" since Ms. Cassirer was a German national and such a taking does not implicate violations of international law. While correct on the law, the Court disagrees with Spain's factual premise.

■ The Court agrees that in order "[t]o fall into this exception, the plaintiff cannot be a citizen of the defendant country at the time of the expropriation, because expropriation by a sovereign state of the property of its own nationals does not implicate settled principles of international law." *Altmann v. Republic of Austria*, 317 F.3d 954, 968 (9th Cir.1998), *aff'd*, 541 U.S. 677, 124 S.Ct. 2240, 159 L.Ed.2d 1 (citations and quotation marks omitted); *Siderman de Blake v. Republic of Arg.*, 965 F.2d 699, 711 (9th Cir.1992) ("*Siderman*"); *Chuidian v. Philippine Nat'l Bank*, 912 F.2d 1095, 1105 (9th Cir.1990). However, once again Plaintiff provides compelling evidence that Ms. Cassirer was not a German citizen at the time of Nazi Germany's taking of the Painting since, according to the Nazis' citizenship laws at that time, "[a] Jew cannot be a citizen of the Reich." (Pl.'s Request for Judicial Notice ("RFJN"), Exs., A, B & C [The New Social Order—Reich Citizenship Laws] Art. 4(1)).[2] Moreover, the law provided that "[a] citizen of the Reich is that subject only who is of German or kindred blood." (*Id.* at Art. 2). Spain's Reply brief completely fails to address this argument and the Court concludes that since Germany itself did not consider Ms. Cassirer to be a

---

1. The Court concludes that at this stage Mr. Petropoulos's testimony on these issues of German history, National Socialism, art looting and the Holocaust cannot be disregarded. (Petropoulos Decl. ¶ 1; *id.*, Ex. A [Petropoulos Curriculum Vitae] ); *see also* Fed.R.Evid. 702.

2. The Court hereby takes judicial notice of these authoritative statements of law under the Nazi German regime. *McGhee v. Arabian Am. Oil Co.*, 871 F.2d 1412, 1424 (9th Cir. 1989) ("[T]he court is permitted to take judicial notice of authoritative statements of foreign law."); Fed.R.Civ.P. 44.1.

citizen, Ms. Cassirer's alleged German "citizenship" at the time of the taking does not preclude the application of the expropriation exception in this case.

**B. PERSONAL JURISDICTION AND DUE PROCESS**

Although it may seem odd to address personal jurisdiction before discussing subject matter jurisdiction, the two issues are intertwined in this case and the Court may properly address personal jurisdiction first. *Anderman v. Fed. Republic of Austria,* 256 F.Supp.2d 1098, 1104 (C.D.Cal. 2003) ("[A] court may determine whether it has personal jurisdiction over a party before proceeding to determine whether it has subject-matter jurisdiction."). 28 U.S.C. § 1330(b), in clear language, states:

> Personal jurisdiction over a foreign state *shall exist* as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this Title.

(emphasis added). Subsection (a) states that the district courts have jurisdiction over any action against a foreign state in any case where the foreign state is not entitled to immunity. In short, if the Court has subject matter jurisdiction over a foreign sovereign or its instrumentality, and properly serves that entity under 28 U.S.C. § 1608, then personal jurisdiction follows as a matter of law under Section 1330(b).[3] As one district court recently explained:

> Unlike most statutes, the FSIA contains a specific provision for personal jurisdiction, conditioning it on effective service of process and the existence of subject matter jurisdiction. Ordinarily, statutes do not contain requirements for personal

jurisdiction. The reason is obvious: the sole source for personal jurisdiction over a *person* is the Constitution. A statute may not provide for personal jurisdiction where the Constitution forbids it. By providing for personal jurisdiction in the FSIA, Congress implicitly endorsed the view that the Constitution does not limit a court's jurisdiction in personam over foreign states.

*Rux v. Republic of Sudan,* No. 2:04cv428, 2005 WL 2086202, at *18, 2005 U.S. Dist. LEXIS 36575, at *66 (E.D.Va. Aug. 26, 2005) (emphasis added). While not expressly determining that foreign states are "persons" for purposes of due process, the Supreme Court has explained:

> personal jurisdiction, like subject-matter jurisdiction, exists only when one of the exceptions to foreign sovereign immunity in §§ 1605–1607 applies. [Citation.] Congress' intention to enact a comprehensive statutory scheme is also supported by the inclusion in the FSIA of provisions for venue, 28 U.S.C. § 1391(f), removal, § 1441(d), and attachment and execution, §§ 1609–1611. Our conclusion here is supported by the FSIA's legislative history. *See, e.g.,* H.R.Rep. No. 94–1487, p. 12 (1976) (H.R.Rep.); S.Rep. No. 94–1310, pp. 11–12 (1976) (S.Rep.) (FSIA "sets forth the sole and exclusive standards to be used in resolving questions of sovereign immunity raised by sovereign states before Federal and State courts in the United States," and "prescribes . . . the jurisdiction of U.S. district courts in cases involving foreign states.").

*Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 435 n. 3, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989); *see also*

---

**3.** Neither Defendant contends that service of process was improper or otherwise ineffective under 28 U.S.C. § 1608.

*Hilao v. Estate of Marcos (In re Estate of Marcos Human Rights Litig.),* 94 F.3d 539, 545–46 (9th Cir.1996). However, since most recently the Supreme Court and this Circuit have sidestepped the issue by "[a]ssuming, without deciding, that a foreign state is a 'person' for purposes of the Due Process Clause," *Republic of Arg. v. Weltover, Inc.,* 504 U.S. 607, 619, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992) (*"Weltover"*); *see also Altmann,* 317 F.3d at 970; *Theo. H. Davies & Co. v. Republic of the Marshall Islands,* 174 F.3d 969, 975 n. 3 (9th Cir.1998), the question of whether a foreign state is a "person" remains unsettled.

At the hearing, Defendants indicated that they agreed with the Court's conclusion that if subject matter jurisdiction exists through the Section 1605(a)(3) exception to sovereign immunity, then personal jurisdiction follows. However, Defendants concede this point only because it dovetails with their claim that the requirements of due process, as articulated in *International Shoe* and its progeny, have been subsumed in the subject matter jurisdiction analysis. On that basis, Defendants argue that the Court must assess whether the sovereign's commercial contacts with the United States are so continuous and systematic as to give rise to general jurisdiction or whether the sovereign's commercial activities in the United States with respect to the expropriated property give rise to specific jurisdiction in this case. Stated in a different way, Defendants contend that they are "persons" under the Due Process Clause, which would then mandate that the Court undertake a "minimum contacts" analysis of the elements of the FSIA exception to sovereign immunity.

The Court disagrees. The Court recognizes that, in a number of decisions, including decisions in this Circuit, courts when confronted with the issue have "assum[ed] without deciding" that foreign sovereigns are "persons" under the Due Process Clause of the Constitution. *See, e.g., Weltover,* 504 U.S. at 619, 112 S.Ct. 2160; *Altmann,* 317 F.3d at 970. Older cases predating *Weltover* and *Altmann* have also held in FSIA cases that, even if the foreign sovereign is not entitled to immunity, the exercise of personal jurisdiction must comport with the Due Process Clause. *E.g., Olsen v. Gov't of Mexico,* 729 F.2d 641, 648 (9th Cir.1984); *Siderman,* 965 F.2d at 705 n. 4 (noting in dictum **one month before** *Weltover* that "the exercise of personal jurisdiction also must comport with the constitutional requirement of due process"). Thus, "[t]he Ninth Circuit has since retreated from this [previous conclusion] by following the *Weltover* court's lead in assuming without deciding that due process was satisfied." *Altmann,* 142 F.Supp.2d 1187, 1207 (C.D.Cal.2001), *aff'd,* 317 F.3d 954 (9th Cir.1998), *aff'd,* 541 U.S. 677, 124 S.Ct. 2240, 159 L.Ed.2d 1 (2004). Moreover, in *Altmann,* the Supreme Court recently reiterated that Congress intended to resolve difficulties regarding the scope of federal jurisdiction over foreign sovereigns "by enacting the FSIA, a **comprehensive statute** containing a 'set of legal standards governing claims of immunity in every civil action against a foreign state **or its political subdivisions, agencies, or instrumentalities.'** " 541 U.S. at 691, 124 S.Ct. 2240 (emphases added). The Court noted that FSIA itself "contains venue and removal provisions" and that "it prescribes the procedures for obtaining personal jurisdiction over a foreign state [in] § 1330(b)." *Id.*

▮ That comprehensive statute provides in plain language that subject matter jurisdiction over a case confers personal jurisdiction over the sovereign so long as the defendant is properly served. In other words, "under the FSIA, 'subject matter

jurisdiction plus service of process equals personal jurisdiction'" and the "Due Process Clause imposes no limitation on a court's exercise of personal jurisdiction over a foreign state." *Abur v. Republic of Sudan,* 437 F.Supp.2d 166, 172 n. 11 (D.D.C. 2006) (quoting *Practical Concepts, Inc. v. Republic of Bolivia,* 811 F.2d 1543, 1548 n. 11 (D.C.Cir.1987)). Nothing in the Act suggests that a minimum contacts analysis must be conducted or that foreign sovereigns should be viewed as "persons" for purposes of a due process analysis. Explaining why a court need look no further than the FSIA's statutory mandate, Judge Cooper, in the *Altmann* District Court decision, wrote:

> The personal jurisdiction requirement recognizes an individual liberty interest that is conferred by the Due Process Clause. *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 703, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982). The personal jurisdiction requirement represents a restriction on judicial power not as a matter of sovereignty, but as a matter of individual liberty. *Id.* It would be illogical to grant this personal liberty interest to foreign states when it has not been granted to federal, state or local governments of the United States. *Flatow[ v. Islamic Republic of Iran,* 999 F.Supp. 1, 21 (D.D.C.1998) ]. Accordingly, this Court holds that a foreign state is not a 'person' under the Due Process Clause of the United States Constitution.

The previously-cited House Report's language is unambiguous—it states that in personam jurisdiction has been addressed within the requirements of the statute; the FSIA does not grant a liberty interest for the purposes of substantive due process analysis. H.R.Rep. No. 1487, 94th Cong., 2d Sess., reprinted in 1976 U.S.Code & Admin. News at 6611–12. This Court joins with the *Fla-tow* court's observation that foreign sovereign immunity, both under the common law and now under the FSIA, has always been a matter of grace and comity rather than a matter of right under United States law. *Verlinden[B.V. v. Cent. Bank of Nig.,* 461 U.S. 480, 486, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983) ], citing *Schooner Exchange v. M'Faddon,* 11 U.S. (7 Cranch) 116, 3 L.Ed. 287 (1812). Where neither the Constitution nor Congress grants a right, it is inappropriate to invent and perpetuate it by judicial fiat.

142 F.Supp.2d at 1208; *see also Price v. Socialist People's Libyan Arab Jamahiriya,* 294 F.3d 82, 96–100 (D.C.Cir.2002) (detailing why and holding that foreign states should not be considered "persons" protected by the Fifth Amendment); *Rux,* 2005 WL 2086202, at *17, 2005 U.S. Dist. LEXIS 36575, at *54.

The Court agrees with the reasoning of these courts and, based on the foregoing, concludes that the question of personal jurisdiction in this case turns on whether or not the Court has subject matter jurisdiction, and that the answer to that question is a matter not of constitutional law but of statutory construction. Accordingly, given the current posture of this case, the Court must determine the meaning of the statutory requirement that a foreign instrumentality be engaged "in a commercial activity in the United States" as a condition to applying the illegal expropriation exception to sovereign immunity.

## C. SUBJECT MATTER JURISDICTION

The expropriation exception to sovereign immunity set forth in 28 U.S.C. § 1605(a)(3) applies in situations where the following four conjunctive elements are present:

(1) that rights in property[ ] are at issue,

(2) that the property was "taken,"

(3) that the taking was in violation of international law, and

(4)(a) "that property ... is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is *engaged in a commercial activity in the United States*"

*Garb*, 440 F.3d at 588 (emphasis added). The first and second prongs of this test are settled since there is no dispute that the Painting was taken from Ms. Cassirer. This leaves the Court with the remaining two elements to analyze.

### 1. "IN VIOLATION OF INTERNATIONAL LAW"

■ As noted above, the Court has already determined that the Complaint alleges that property was taken in violation of international law and that the statutory exception permits suits to be brought against foreign sovereigns even if the sovereign, like Spain in this case, had no involvement in the initial illegal taking. In addition, and as also articulated above, the element does not fail on the grounds that the Painting was taken by Scheidwimmer or because it was taken from Ms. Cassirer who was not considered a citizen by the government that took the property.

According to Spain, however, this "in violation of international law" element is nonetheless not satisfied since the alleged extortion of the Painting by an official appraiser and agent of the Nazi government in exchange for an exit visa out of Germany (and her life) and $360 that Ms. Cassirer would never see since it was deposited into a blocked bank account does not constitute a violation of international law.[4]

To make this point, Spain relies heavily on *Sosa v. Alvarez–Machain*, 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004), a case in which the DEA hired Mexican nationals to abduct a Mexican doctor, who had been indicted for the murder and torture of a DEA agent, and to deliver him to the custody of federal agents in the United States. After the doctor prevailed in the criminal case, he sued the United States and several individuals in federal court for, among other things, false arrest and detention. Construing the Federal Tort Claims Act and the Alien Tort Statute, the Supreme Court held that "a single illegal detention of less than a day, followed by the transfer of custody to lawful authorities and a prompt arraignment, violates no norm of customary international law so well defined as to support the creation of a federal remedy." *Id.* at 738, 124 S.Ct. 2739. Spain (though not the Foundation) suggests that this case has articulated a new standard for assessing what it means to violate international law, and that the *Siderman* test is no longer controlling.

The argument is unpersuasive because neither the Alien Tort Statute nor the Federal Tort Claims Act are at issue, and nothing in those statutes or their construction provides any help in construing the provisions of Section 1605(a)(3). Moreover, *Sosa* focused exclusively on those circumstances under which a detention constitutes a violation of international law, since those questions are not resolved by statute. But here the Court is dealing with a statute where Congress has expressly provided for jurisdiction over claims arising from "property taken in violation of international law." 28 U.S.C. § 1605(a)(3). *Sosa* provides no guidance in determining the meaning of that phrase.

---

4. At the hearing the Foundation indicated that it takes no position on whether the initial taking of the Painting violated international law.

FSIA cases, on the other hand, have examined the meaning of the phrase and, drawing from the Restatement of Foreign Relations law, have held that "[i]f a taking violates any one of the [following] proscriptions, it violates international law." *Siderman,* 965 F.2d at 712. These proscriptions include "injury resulting from: (1) a taking by the state of the property of a national of another state that[:] (a) is not for a public purpose, or (b) is discriminatory, or (c) is not accompanied by provision for just compensation . . . ." *Id.; Altmann,* 317 F.3d at 968 ("[T]he Klimt paintings have been wrongfully and discriminatorily appropriated in violation of international law."); *see also West v. Multibanco Commermex, S.A.,* 807 F.2d 820, 831 (9th Cir. 1987); *Greenpeace, Inc. (U.S.A.) v. France,* 946 F.Supp. 773, 783 (C.D.Cal. 1996).

Looking to this standard, the Court concludes that the taking was discriminatory and without just compensation. Indeed, the Nazis stripped the Jews of their citizenship and took their property, including the Painting in this case. The $360 provided for the Painting now allegedly worth many millions of dollars was not just compensation, especially when the payment is viewed in conjunction with the allegation that Ms. Cassirer could never even withdraw the funds since they were paid into a blocked bank account, thereby effectively receiving nothing for the Painting. In any event, "[a]t th[is] jurisdictional stage, we need not decide whether the taking actually violated international law; as long as a 'claim is substantial and non-frivolous, it provides a sufficient basis for the exercise of our jurisdiction.'" *Siderman,* 965 F.2d

at 711 (citation omitted); *Altmann,* 317 F.3d at 958–59 (finding the plaintiff's allegations, which arise from very similar facts, to satisfy the jurisdictional requirement); *Greenpeace, Inc. (U.S.A.),* 946 F.Supp. at 782. The Court is more than satisfied that, at this point, Plaintiff has made the required showing.

### 2. "ENGAGED IN A COMMERCIAL ACTIVITY IN THE UNITED STATES"

█ The final question presented in the jurisdictional analysis is whether Spain and/or the Foundation are engaged in "a commercial activity in the United States" within the meaning of the statute, in which case the expropriation exception applies and the litigation may proceed in this Court. The Court concludes that this element is also satisfied as to both Defendants.

The statute defines commercial activity as follows:

A 'commercial activity' means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

28 U.S.C. § 1603(d).[5] Case law further explains that, regardless of the motive behind a particular activity, that activity is "commercial" if it is the type through which a private party engages in trade or commerce. *Weltover,* 504 U.S. at 614, 112 S.Ct. 2160; *Tei Yan Sun v. Taiwan,* 201 F.3d 1105, 1107 (9th Cir.2000); *Malewicz,* 362 F.Supp.2d at 313. Thus, the establish-

---

**5.** Subsection (e), which defines "commercial activity carried on in the United States by a foreign state," relates to the exception set forth in 28 U.S.C. § 1605(a)(2) and a disjunctive prong of 28 U.S.C. § 1605(a)(3) which requires property to be present in the United

States. As to those provisions, 28 U.S.C. § 1603(e) requires commercial activity "carried on by such state and having substantial contact with the United States." Subsection (e)'s requirements, however, are not at issue here.

ment of a tariff would be a sovereign act because private parties do not regulate foreign trade, but contracting to purchase boots for an army would be a "commercial activity" because it is the type of conduct in which private parties may engage. *Altmann*, 142 F.Supp.2d at 1204.

The statutory language imposes no requirement that the commercial activity relate in any way to the illegally expropriated property. Nor does it even suggest that the exception applies only where the foreign sovereign is engaged in continuous and systematic commercial activity within the United States. On the contrary, Section 1603(d) defines "commercial activity" to include *either* a regular course of conduct *or a* particular transaction or act. And despite the contention of Defendants, the Court is not limited to a consideration of the foreign instrumentality's commercial activities that occur entirely within the United States. The legislative history cited by Defendants that supposedly supports such a limitation suggests otherwise:

As paragraph (d) of section 1603 indicates, a commercial activity carried on in the United States by a foreign state would include not only a commercial transaction performed and executed in its entirety in the United States, but also a commercial transaction or act having a 'substantial contact' with the United States. This definition includes cases based on commercial transactions performed in whole or in part in the United States, import-export transactions involving sales to, or purchases from, concerns in the United States, business torts occurring in the United States (cf. Sec.1605(a)(5)), and an indebtedness incurred by a foreign state which negotiates or executes a loan agreement in the United States, or which receives financing from a private or public lending institution located in the United States—for example, loans, guarantees or insurance provided by the Export–Import Bank of the United States.

H.R.Rep. No. 94–1498 at 17, *as reprinted in* 1976 U.S.C.C.A.N. at 6615–16.

Case law supports the Court's conclusion that limited commercial activity is sufficient to bring this case within the expropriation exception to sovereign immunity. For example, on this question of "commercial activity," the Ninth Circuit in *Altmann* explained:

Because Appellants profit from the Klimt paintings in the United States, by authoring, promoting, and distributing books and other publications exploiting these very paintings, these actions are sufficient to constitute 'commercial activity' for the purpose of satisfying the FSIA, as well as the predicates for personal jurisdiction.

317 F.3d at 959. The court explained that these commercial contacts *"far exceed[ ]* that which we[re] found sufficient to justify applying § 1605(a)(3) in *Siderman."* *Id.* at 969 (emphasis added). The court noted that "[t]he key commercial behavior of the Gallery here is not its operation of the museum exhibition in Austria, however, but its publication and marketing of that exhibition and the books [such as *Klimt's Women* ] in the United States." *Id.* Moreover, it was the activity of selling the books, and not the appearance of the particular paintings in the books, that warranted the exercise of jurisdiction. Thus, while three of the Klimt paintings were not featured in *Klimt's Women,* which was published in English and distributed in the United States, the court found jurisdiction to exist over the dispute as to all six paintings.

While the contacts in *Altmann* far exceeded the minimum commercial contacts sufficient to warrant the exercise of jurisdiction, *Siderman* found jurisdiction in a

case that involved a much lower level of "commercial activity." In *Siderman* the plaintiffs, a Jewish family residing in Argentina in the 1970s, were persecuted, tortured, harassed, and forced to leave the country by an anti-semitic military junta that seized control of the government. After one member of the family was severely tortured over a period of several days, he was told to leave the country or he and his family members would be killed. The family quickly gathered what they could, made arrangements to have someone oversee their family business, which included the Hotel Gran Corona in Tucuman, Argentina, and fled to the United States. Thereafter, the Argentine dictatorship altered the family's real property records to show that the Sidermans had owned not 127,000 acres, but 127 acres of land in the province and ultimately seized the family business through a sham judicial proceeding. Some years later, the family, one of whom was a United States citizen, brought suit in federal court asserting, among other things, that the court had subject matter jurisdiction under the expropriation exception to the FSIA. *Siderman*, 965 F.2d at 703. As to that exception, the Ninth Circuit noted that Argentina had undertaken operation of the Hotel Gran Corona, that is solicited and entertained American guests at the hotel, and accepted their credit cards and traveler's checks in payment for the costs of lodging. This was enough for jurisdic-

tional purposes "to show that Argentina is engaged in *a commercial activity* in the United States." *Id.* at 712 (emphasis added). This was the only commercial contact the court relied on in concluding that the plaintiffs properly had alleged facts to invoke the expropriation exception. Even though the court "emphasize[d] the preliminary nature" of the holding, pending further development of the factual record, it was sufficient to satisfy the plaintiff's initial burden. *Id.* at 712–13. Here, however, Defendants have been permitted to rebut Plaintiff's allegations of jurisdiction, and their attempts to argue that the Foundation's or Spain's contacts are strictly sovereign are unpersuasive and simply unsupported given the case law on this point.[6]

The Court concludes that while the commercial activity presented in this case falls somewhere below what was found to "far exceed[ ]" the threshold in *Altmann*, it is sufficient at this point to invoke the expropriation exception. That is, after reviewing the evidence from the grant of jurisdictional discovery, the Court finds the following commercial activity in this case.

### a. The Foundation's Purchases and Sales in the United States[7]

The Foundation has engaged in commercial transactions in the United States both as a purchaser and a seller. For example, as a buyer, it has entered into

---

**6.** Notably, the *Siderman* court also found the following contacts sufficient to satisfy Section 1603(e)'s more rigorous "substantial contact with the United States," 28 U.S.C. § 1603(e), which is a heavier burden than what Plaintiff here carries under 28 U.S.C. § 1603(d):

> Argentina advertises the Hotel Gran Corona in the United States and solicits American guests through its U.S. agent, Aerolinas Argentinas, the national airline of Argentina. They have alleged further that numerous Americans have stayed at the Hotel, which accepts all the major American credit

cards, including Mastercard, Visa, and American Express.

*Siderman*, 965 F.2d at 709.

**7.** The Court briefly notes that if the Foundation—an alleged agency and instrumentality of Spain—has sufficient commercial contacts to satisfy "a commercial activity" as set forth at the end of 28 U.S.C. § 1605(a)(3), then those contacts are also sufficient to hold Spain to answer under this exception because a foreign *state* is not immune is when a foreign state's agency or instrumentality is engaged in "a commercial activity."

media licensing agreements with United States museums (*e.g.*, Maxon Decl., Ex. A [Compendium of the Foundation's Commercial Purchases] at Bates 0125–28, 0168–70, 0174–75), and has entered into dozens, if not hundreds of transactions with United States businesses to purchase posters, post cards, and related materials. (*See generally e.g. id.*, Ex. A [Compendium of the Foundation's Commercial Purchases] ). Likewise, the Foundation has used its credit card in the United States to purchase books from Amazon.com and book stores in New York and California. (*See, e.g., id.* at Bates 0442, 0476). As particularly ironic examples, the Foundation purchased through Amazon.com *The Lost Museum: The Nazi Conspiracy to Steal the World's Greatest Works of Art,* (Maxon Decl., Ex. A [Compendium of the Foundation's Commercial Purchases]; *id.* at Bates 0442), purchased the art book "Abe 566 Pisarro [sic]" from Warren Art Books in New Jersey, (*id.* at Bates 0512), and from the American Association of Museums in Washington, DC purchased a volume on *Museum Policy and Procedure for Nazi Era Issues,* (*id.* at Bates 0471).

As a seller, the Foundation has sold to United States residents and business posters and books, and has licensed the reproduction of images to various United States businesses. (*Id.,* Ex. C [Compendium of the Foundation's Commercial Sales] at Bates 0677 (Receipt for sale of Pissarro poster to individual residing in Wichita, Kansas)). Even more important is *a purchase by an individual in the Central District of California of a poster of the Pissarro Painting charged to her American Express credit card.* (*Id.,* Ex. C [Request and Sale of Pissarro Poster] at Bates 584–85; *see also id.* at Bates 709 (Receipt for sale from Foundation of Pissarro poster to individual residing in Winston–Salem, North Carolina)). The Foundation communicated with American purchasers through e-mail communica-

tions (*e.g., id.* at Bates 0713, 0715), and sold copies of its Thyssen–Bornemisza Collection Guide. (*Id.* at Bates 0715.) Finally, while it is difficult definitively to confirm based on the submitted evidence, Plaintiff alleges that several catalogues and publications containing copies of the Painting were also sold by the Museum. (*Id.* at Bates 0671, 0705, 0721; Opp. to Foundation Mot. at 14 n. 4).

Indeed, the Foundation admits that "in limited circumstances, [it] has worked with entities in the United States to provide goods or products to be sold in the Museum gift shop [and] from time to time[ ] has *paid citizens of the United States to write essays for [its exhibition] catalogs.*" (Maxon Decl., Ex. B [Response to Interrogatories] No. 3 (emphasis added)). Moreover, the Foundation admits that the "Museum's gift shop sells items to any visitors, and has ... shipped items [to] the United States." (*Id.*).

**b. The Foundation's Retention of Services in the United States**

The Foundation has commissioned services for its Museum by individuals in the United States, such as the purchase of an essay for one of its exhibitions, (*e.g., id.,* Ex. D [Compendium of the Foundation's Purchased Services] at Bates 0273), and the solicitation, recruitment, and invitation of an individual at the Institute of Fine Arts in New York to lecture at the Foundation's Museum, (*id.* at Bates 0366–70). Indeed, there is evidence of several other such recruitments and speaking engagements in exchange for the Foundation's payment to these individuals.

**c. The Foundation's Granting Permission for Filming in the Museum which Resulted in Iberia Airlines Featuring a Video and Discussion About the Painting on Flights between the United States and Spain**

There is undisputed evidence that the Foundation gave permission to Transvi-

sion, a video production company, to film a program in the Museum. (7/6/06 Henestrosa Decl. ¶ 14). As a result of that granted access, an "Artemario" in-flight program on the Spanish Iberia Airlines flights between Spain and the United States features the precise Camille Pissarro Painting at issue herein. (Lee Rappaport Decl. ¶ 4; John Rappaport Decl. ¶ 4). The in-flight program depicts the Painting, which is identified by the painter, Camille Pissarro, in the Foundation's Museum and the DVD contains a lengthy five-minute explanation of the Painting, its history, its location in the Museum, and discussion about Pissarro himself. (Not. of Lodging, Ex. F [Programa Iberia In & Out—Pissarro]).

Iberia Airlines maintains that while there is no formal agreement or contract with the Foundation or Museum, these entities "are aware that the programs are aired on [its] intercontinental flights." (Maxson Decl., Ex. I [E-mail Communication with Iberia Airlines] at p. 676). As a result, several tens—if not hundreds—of thousands of airline passengers viewed the Pissarro presentation on at least 200 flights between the United States, which no doubt serves as a powerful marketing tool to entice U.S. tourists aboard these Iberia flights to visit the Foundation's museum while visiting Spain. (Maxson Decl., Ex. J [E-mail Communication from Iberia Airlines]). There is evidence that over 34 artworks from the Museum's collection—including the Painting itself—have each been the subject of an "Artemario" program on Iberia Airlines. (Pollan Decl. ¶¶ 3–4).

**d. Marketing and Commercial Promotion in the United States**

The Foundation has regularly advertised several of its exhibitions in internationally distributed art magazines, including those circulated in the United States. (Maxson Decl., Ex. L [The Museum's Advertising Contacts] at Bates 0001–02). Moreover, there is evidence that exposition notices were also sent to other international news publications such as *Newsweek* and *Time Magazine*, and that the Foundation advertises in the *New Yorker*. (*Id.* at Bates 0042). Many of these notices were also sent to Spain's various tourism offices located throughout the United States, including in Beverly Hills, California. (*Id.* at Bates 0038–39). The Foundation admits that it mails its Museum bulletin entitled "Perspectives" to addresses throughout the world, including 55 in the United States, and two in the Central District of California. (7/6/06 Henestrosa Decl. ¶ 10).

In addition, while it is unclear who paid for the advertisements and the Foundation denies having done so, (8/14/06 Hearing Tr. at 12–13), several advertisements of the Foundation's Museum were taken out in the *New York Times*. The advertisements provided the location of local tourist offices in the United States, their contact information along with Iberia's contact information, and the advertisements mention the Museum itself and encourage visitors to visit Spain and these tourist attractions there. (Maxson Decl, Ex. S [11/10/03 *New York Times* Advertisement] at p. 905–07). Specifically, the advertisements state: "If you love art and culture, Madrid is your destination.... [A] unique itinerary [ ] takes you from El Prado to the Thyssen–Bornemisza [Museum]... Come and experience their genius." (*Id.*). These contacts only reinforce a finding of a commercial activity.

**e. Other Non–Sovereign Commercial Activities in the United States**

While the Foundation has never loaned the Painting to a museum in the United States, (Henestrosa Mot. Decl. ¶ 17), the Foundation has borrowed and borrows artworks from individuals and institutions

in the United States. (*Id.* ¶ 16). In fact, some agreements even charged the Foundation a fee for the loans, albeit a nominal $200. (*See, e.g.,* Maxson Decl., Ex. Q [Compendium of Borrowers' Loan Agreements] at Bates 1159). This evidence exists, even in the face of Henestrosa's declaration that "[t]he Foundation does not receive payment for the loan of its artworks or pay to borrow artworks from others." (Henestrosa Mot. Decl. ¶ 16). Many of the artworks borrowed by Spain fetched hundreds of thousands of visitors a year. (Maxson Decl., Ex. Q [Compendium of Borrowers' Loan Agreements] at Bates 2050–51). While Henestrosa maintains that these "exchanges are reciprocal educational and cultural activities designed to promote the international understanding and appreciation of art," (Henestrosa Mot. Decl. ¶ 16), as the Court has already explained, the purpose is not relevant in assessing commercial activity. *Altmann,* 317 F.3d at 969. Indeed, the *Malewicz* court held that the loan of paintings to museums in the United States—albeit the same paintings that were at issue there— constituted a commercial activity since "[t]here is nothing 'sovereign' about the act of lending art pieces, even though the pieces themselves might belong to a sovereign." *Malewicz,* 362 F.Supp.2d at 314. The Court explained that "because the international loan of artworks between museums can and does occur with potential sales of the works contemplated by the parties (which is undoubtedly 'commerce' in the traditional sense), and because it is the type of activity—not its purpose—that must guide the analysis," the city's argument that the "exchange of artworks between not-for-profit organizations in different countries" was not commerce must fail. *Id.*

The Foundation has also loaned many of its artworks to institutions in the United States and similarly charged nominal, ad-ministrative fees associated with the loans. (*See, e.g.,* Maxson Decl., Ex. R [Compendium of the Foundation's Loan of Artwork] at Bates 0955 (Foundation Loan to the Metropolitan Museum of Art)).

Other commercial activities exist. Through the Museum's website, www.museothyssen.org, U.S. citizens may sign up for newsletters, view the Foundation's collection—including the Pissarro Painting—and purchase advance admission tickets through links to third-party vendors. (Henestrosa Mot. Decl. ¶¶ 14–15).

Finally, as they relate directly to Spain, the Foundation's motion and Henestrosa's declaration assert that "none of the tourism offices' materials depict, mention, or feature the Painting." (Foundation Mot. at 10; Henestrosa Mot. Decl. ¶ 12). However, the Court's review of the record reveals that at least one Museum brochure distributed by Spain's Beverly Hills tourism office mentions Pissarro by name. (Paxson Decl., Ex. M [Brochures] at Bates 0015–18, Defs.' Bates 725–28; Cabanas Decl. ¶ 6). Moreover, as recently as this month the *New Yorker* magazine, in a "special advertising section," featured the Museum itself and a discussion of the Baron's collection. (8/17/06 Hall Decl., Exs. A [7/31/06 *New Yorker* Magazine] & B [8/7/06—8/14/06 *New Yorker* Magazine]).

### f. Conclusion re: Commercial Activity

The Court concludes that Defendants have engaged such numerous commercial contacts with the United States that the "commercial activity" element of the expropriated property exception is easily established. While *Altmann* had more direct publications in the U.S. of at least some of the paintings at issue, here there are sales to United States residents of reproductions of the Painting, (*e.g.,* Maxson Decl., Ex. C [Request and Sale of Pissarro Poster] at Bates 0584–85; *see*

*also id.* at Bates 0709), and hundreds of other contacts involving the purchase and sale of merchandise as described above, some of which are directly related to Pissarro and even the Painting itself. The Court's conclusion is consistent with the legislative history of the FSIA, which explains that "[p]aragraph (c) of section 1603 defines the term 'commercial activity' as including a broad spectrum of endeavor, *from an individual commercial transaction or act* to a regular course of commercial conduct." H.R.Rep. No. 94–1498 at 16, *as reprinted in* 1976 U.S.C.C.A.N. at 6614 (emphasis added). As such, the evidence submitted is more than sufficient to support Plaintiff's contention that there exists "*a* commercial activity" for purposes of 28 U.S.C. § 1605(a)(3). *See Adler,* 107 F.3d at 725 (for purposes of 28 U.S.C. § 1605(a)(2), Nigeria engaged in commercial activity within the meaning of section 1603(d) by entering into "an agreement" for the assignment of a contract in exchange for consideration).

**g. The Policy Question**

In the end, Defendants argue against the Court's conclusion through predictions of doom and gloom if the statute is not construed more narrowly. The Court's ruling, they say, will convert the federal district courts into international courts of claim for those seeking recovery of property looted by the Nazi regime. The argument contains several flaws.

 First, the issue now before the Court is not about jurisdiction over all illegally expropriated property but rather about such property that is in the hands of a foreign sovereign. The statutory limits placed on the exercise of jurisdiction—that the property have been taken in violation of international law, that it be in the hands of a foreign sovereign, and that the sovereign be engaged in a commercial activity in the United States—suggest that the number of such cases is likely to be small. The Court finds more traction on this supposed slippery slope than do Defendants. But even if the statute opens the courthouse up to a large volume of international litigation, that result flows directly from the language of the statute, which reflects Congressional policy. For the Court to construe the statute to mean something other than the meaning suggested by its text would be to substitute the Court's policy determination for that of Congress. Policy questions, especially in an area that involves foreign relations, should be decided by the political branches of government. *See Patsy v. Bd. of Regents,* 457 U.S. 496, 513, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982) (exhaustion context) (superseded on other grounds) ("The very difficulty of these policy considerations, and Congress' superior institutional competence to pursue this debate, suggest that legislative not judicial solutions are preferable."). Thus, this Court believes "[a]s judges, of course, we must apply statutes as written, not as they should have been written with the benefit of hindsight." *Gardenhire v. IRS (In re Gardenhire),* 209 F.3d 1145, 1152 (9th Cir. 2000) (policy decisions should be left to Congress). If experience teaches that the statute as written overburdens the Court with suits brought against foreign sovereigns under the expropriation exception, then Congress, with the benefit of that experience, can amend or re-write the statute. The Court doubts that this will be necessary.

Thus, while this case presents the Court with the novel situation where the foreign sovereign has had no role in the illegal taking of the property in dispute and its commercial activities in the United States have only occasionally related to that property, the Court concludes that the statute confers jurisdiction over the subject matter of the lawsuit. Since Plaintiff "offers

evidence that an FSIA exception to immunity applies, the party claiming immunity bears the burden of proving by a preponderance of the evidence that the exception does not apply." *Siderman*, 965 F.2d at 708; *accord Randolph v. Budget Rent–A–Car*, 97 F.3d 319, 324 (9th Cir.1996). The Court holds that Plaintiff has satisfied this burden and Defendants have not rebutted this presumption, and therefore there exists a substantial, nonfrivolous basis for this Court's exercise of subject matter jurisdiction under 28 U.S.C. § 1605(a)(3) of the FSIA.

### D. VENUE

█ Pursuant to the FSIA statute:

A civil action against a foreign state … may be brought … (3) in any judicial district in which the agency or instrumentality is licensed to do business or *is doing business*, if the action is brought against an agency or instrumentality of a foreign state as defined in section 1603(b) of this title [28 USCS § 1603(b) ]; or (4) in the United States District Court for the District of Columbia if the action is brought against a foreign state or political subdivision thereof.

28 U.S.C. § 1391(f) (emphasis added); *see also Altmann*, 317 F.3d at 972. Despite Defendants' arguments to the contrary, venue in this District is proper pursuant to this section since Defendants are "doing business" in this District and the finding that Defendants are engaged in "a commercial activity" in the United States is sufficient to satisfy the FSIA's venue provision. (Compl.¶ 13); *Altmann*, 142 F.Supp.2d at 1215 *aff'd*, 317 F.3d at 971–72 (venue in the Central District is proper as to both the foreign state defendant and its alleged agent and instrumentality). Here, the commercial activity contacts aside, two residents of this District viewed the Pis-

sarro "Artemario" program on the Iberia Airlines flight, a local resident ordered and purchased a copy of the Pissarro Painting from the Museum, which was charged to the U.S. resident's American Express card and shipped to this District, (Maxson Decl., Ex. C [Request and Sale of Pissarro Poster] at Bates 0584–85), and the Foundation sends its bulletin "Perspectives" to at least two residents of the District, (7/6/06 Henestrosa Decl. ¶ 10). Thus, the Foundation's claims that it is not "doing business" in the Central District are unfounded. (*See* Foundation Mot. at 14). *Altmann's* reasoning is persuasive:

Because the publications and advertisements of the Austrian Gallery that form the basis for jurisdiction under the FSIA have been distributed in the Central District of California, we hold that the Austrian Gallery, an agency or instrumentality of Austria, is 'doing business' in the district and that venue is therefore proper in the Central District under § 1391(f)(3).

317 F.3d at 972. The Court holds that venue in this District is proper in this case as well.

### E. SPAIN'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

The final issue is Spain's motion to dismiss under Rule 12(b)(6). Spain claims that Plaintiff fails to allege that Spain has done anything improper and it is not alleged that "Spain is currently an owner or possessor of the Painting." (Spain Mot. at 18).

█ Given the foregoing analysis, Spain cannot prevail on this motion. First, as to the declaratory relief action, Plaintiff has alleged a "case or controversy" against Spain since it is alleged—and in fact admitted by the Foundation—that the Foundation is an agent or instrumentality of the Spanish government, and that the Founda-

tion possesses and purports to own the Painting which Plaintiff claims is rightfully his.

■ Second, Plaintiff's claim for a constructive trust requires: "(1) the existence of res (property or some interest in property); (2) the right of the complaining party to that res; and (3) some wrongful acquisition *or detention of the res by another party* who is not entitled to it." *In re Real Estate Assocs. P'ship Litig.*, 223 F.Supp.2d 1109, 1140 (C.D.Cal.2002) (emphasis added). Spain's own cited case makes clear that wrongful detention of the res by another party is sufficient for purposes of the imposition of a constructive trust. As such, Spain's argument fails given the allegations in the Complaint.

■ Third, Plaintiff asserts a claim for conversion, which is defined as "the wrongful exercise of dominion over the property of another." *Burlesci v. Petersen*, 68 Cal.App.4th 1062, 1066, 80 Cal. Rptr.2d 704 (1998). "The elements of a conversion claim are: (1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages." *Id.* Spain contends that Plaintiff has not alleged that Spain exercises any dominion or control over the Painting. This slight distinction, however, is immaterial since the Complaint clearly alleges—and the Foundation admits—that the Foundation is an agent or instrumentality of Spain. Moreover, Spain's actions directly contradict its argument since at this point it is undisputed that in 2001 Plaintiff asked Spain's then Minister of Education, Culture and Sports, Pilar del Castillo Vera, for the Painting's return and the request was refused. (Compl.¶ 32). Thus, at this stage the allegations and factual assertions are sufficient to support a claim that Spain ex-

ercises dominion and control over the Foundation and hence the Painting.

■ Finally, Plaintiff asserts a claim for possession of the Painting, which is essentially a claim for replevin under the common law term. "In federal courts, replevin is a remedy specifically approved by rule, as governed by the appropriate state law." *Adler v. Taylor*, No. CV 04–8472(RGK), 2005 WL 4658511, at *3, 2005 U.S. Dist. LEXIS 5862, at *8 (C.D.Cal. Feb. 2, 2005). "For specific recovery, Plaintiff[ ] only need show (1) a right to possession of the property, and (2) [the defendant's] wrongful possession." *Id.*, 2005 WL 4658511, at *3, 2005 U.S. Dist. LEXIS 5862, at *9 (citations omitted). Replevin is simply a remedy for conversion and when a complaint "supports a conversion claim, it also supports a specific recovery remedy." *Id.* Therefore, because the Court concludes that Plaintiff has stated a claim for conversion, Plaintiff's request for replevin also survives. Thus, Spain's motion to dismiss for failure to state a claim is **DENIED**.

## III.

## CONCLUSION

The Court concludes that Plaintiff properly has alleged and supported with jurisdictional discovery a "non-frivolous" claim that the expropriation exception to the FSIA applies such that this Court has subject matter jurisdiction over the case as to both Defendants. Moreover, the Court has personal jurisdiction over both Defendants under the express terms of the FSIA, 28 U.S.C. § 1330(b). In addition, following controlling authority from this Circuit, the Court holds that venue in this District is proper. Finally, and largely based on the foregoing analysis, Plaintiff's causes of action do not fail to state a claim for relief against Spain. Therefore, Defen-

dants' motions are **DENIED**, and given the controlling questions of law presented for which there is substantial ground for difference of opinion, this Order is hereby **CERTIFIED** for appeal pursuant to 28 U.S.C. § 1292(b).

IT IS SO ORDERED.