**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CLAUDE CASSIRER,
                     *Plaintiff-Appellee,*

v.

KINGDOM OF SPAIN, a foreign state,
                     *Defendant,*

and

THYSSEN-BORNEMISZA COLLECTION
FOUNDATION, an agency or
instrumentality of the Kingdom of
Spain,
                     *Defendant-Appellant.*

No. 06-56325

D.C. No.
CV-05-03459-GAF

---

CLAUDE CASSIRER,
                     *Plaintiff-Appellee,*

v.

KINGDOM OF SPAIN, a foreign state,

                     *Defendant-Appellant,*

and

THYSSEN-BORNEMISZA COLLECTION
FOUNDATION, an agency or
instrumentality of the Kingdom of
Spain,
                     *Defendant.*

No. 06-56406

D.C. No.
CV-05-03459-GAF

OPINION

Appeal from the United States District Court
for the Central District of California
Gary A. Feess, District Judge, Presiding

12691

Argued September 24, 2007
Submitted September 8, 2009
Pasadena, California

Filed September 8, 2009

Before: Thomas G. Nelson, Sandra S. Ikuta, and
N. Randy Smith, Circuit Judges.

Opinion by Judge N.R. Smith;
Partial Concurrence and Partial Dissent by Judge Ikuta

## COUNSEL

William M. Barron of Alston & Bird, LLP, New York City, New York; Anthony A. De Corso of Beck, De Corso, Daly, Kreindler & Harris, for defendant-appellant the Kingdom of Spain.

Thaddeus J. Stauber and Walter T. Johnson of Nixon Peabody, LLP, Los Angeles, California, for defendant-appellant Thyssen-Bornemisza Collection Foundation.

Stuart R. Dunwoody of Davis Wright Tremaine, LLP, Los Angeles, California, for plaintiff-appellee Claude Cassirer.

## **OPINION**

N.R. SMITH, Circuit Judge:

Claude Cassirer ("Cassirer") filed this action in federal district court against the Kingdom of Spain ("Spain") and the Thyssen-Bornemisza Collection Foundation (the "Foundation")[1] to recover a Camille Pissarro painting now on display at the Foundation's museum in Madrid, Spain. Cassirer alleges that the painting was taken from his grandmother in violation of international law in 1939 by an agent of the government of Nazi Germany. On appeal, Appellants challenge the district court's denial of their respective motions to dismiss for lack of (1) personal jurisdiction, (2) standing, (3) a justiciable case or controversy, and (4) subject matter jurisdiction based on sovereign immunity.

We dismiss this appeal with regard to Appellants' challenges to personal jurisdiction, standing, and the existence of a justiciable case or controversy. We lack appellate jurisdiction because there has been no final judgment and these issues are not immediately appealable under the collateral order doctrine.

However, under the collateral order doctrine, we have jurisdiction to consider the issue of sovereign immunity. *Gupta v. Thai Airways Int'l, Ltd.*, 487 F.3d 759, 763, 764 n.6 (9th Cir. 2007). We consider for the first time whether the expropriation exception of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605(a)(3), applies when the foreign state (against whom a claim is made) is not the entity that expropriated the property in violation of international law. We hold that it does. We also hold that advertising and promotional activity, purchase and sale of goods and services, and the exchange of artwork with persons and entities, all within

---

[1]When referred to collectively, Spain and the Foundation are referred to as "Appellants."

the United States, are sufficient to constitute "commercial activity in the United States" under § 1605(a)(3). Finally, based on guidance in our recent decision in *Sarei v. Rio Tinto, PLC*, 550 F.3d 822, 832 (9th Cir. 2008) (en banc) (plurality opinion), we remand to the district court to determine, in the first instance, whether the circumstances of this case warrant judicial imposition of an exhaustion requirement.

## I.  Background.

For the purposes of this appeal, we take the factual allegations in this case as true.[2] At the heart of the present dispute is the *Rue Saint-Honoré, après-midi, effet de pluie* (the "Painting"), an oil painting by the French impressionist master Camille Pissarro. The Painting was originally purchased in 1898 by Cassirer's great-grandfather, Julius Cassirer, a member of a wealthy Jewish family living in Germany. The Painting remained in the family for the next forty years. First passing upon Julius's death to his son, Fritz, and later to Fritz's widow, Lilly Cassirer.

In 1939, as persecution of Jews living in Nazi Germany increased, Lilly and her new husband sought official permission to leave Germany and take their possessions, which included the Painting. Before granting permission, the Nazi government appointed Munich art dealer Jakob Scheidwimmer as the official appraiser to evaluate the works of art that Lilly wished to take with her. After his appraisal, Scheidwimmer refused to allow Lilly to take the Painting out of Germany and demanded that she sell it to him for approximately

---

[2]In reviewing the district court's denial of a motion to dismiss, we accept all well-pleaded factual allegations in the complaint as true, *Altmann v. Republic of Austria*, 317 F.3d 954, 962 (9th Cir. 2002) (citing *Zimmerman v. City of Oakland*, 255 F.3d 734, 737 (9th Cir. 2001)), *amended by* 327 F.3d 1246 (9th Cir. 2003), *aff'd by* 541 U.S. 677 (2004), and determine whether the factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

$360. Because she feared she would not be allowed to leave Germany, she relinquished the Painting, knowing that she would never receive the funds she was promised.[3]

Scheidwimmer traded the Painting to another art dealer who, also persecuted by the Nazis, fled Germany and took the Painting to Holland. After Germany invaded Holland, the Gestapo confiscated the Painting and returned it to Germany, where it was sold at auction to an anonymous purchaser in 1943. The Painting surfaced at a New York gallery in 1952 and was then sold to a private collector in St. Louis. It was sold again in 1976 to an unknown dealer, who subsequently sold it to Baron Hans-Heinrich Thyssen-Bornemisza (the "Baron"), a resident of Switzerland and one of the world's foremost private art collectors.

In 1988, Spain paid the Baron $50 million to lease his collection for ten years. Five years into the lease, Spain paid the Foundation approximately $327 million to purchase the Baron's entire collection, including the Painting. Under the terms of the purchase, Spain provided the Foundation a palace in Madrid, free of charge, for use as the Thyssen-Bornemisza Museum (the "Museum"). In addition, the purchase agreement requires that the collection be exhibited at the Museum in Spain and sets limits regarding loans to other art institutions. If the collection is not used in accordance with the purchase agreement or if the Foundation ceases to exist, Spain will become the owner of the collection.[4]

---

[3]Lilly's sister, who remained in Germany, was later imprisoned in the Theresienstadt extermination camp, where she was subsequently killed. Lilly died in 1962, never having recovered the Painting or learned of its whereabouts.

[4]Under Spanish law, at least two-thirds of the Foundation's Board of Directors must be representatives of Spain, who are nominated and removed freely by the Spanish government through royal decree. Currently, Spain's Minister of Culture, Secretary of State for Culture, Secretary of State for Budget and Expenses, and Undersecretary of Culture all sit as *ex officio* members of the Foundation's Board.

In 2000, Claude Cassirer,[5] the grandson and heir of Lilly Cassirer, discovered that the Painting was on display in Madrid at the Museum. He petitioned Spain's Minister for Education, Culture and Sports (who was also chair of the Foundation's Board), requesting the return of the Painting. His request was denied. In July 2003, five United States Congressmen wrote to the Minister, again requesting that Appellants return the Painting to Cassirer. The request was again denied. Cassirer never attempted to obtain the Painting through judicial proceedings in Spain.

On May 10, 2005, Cassirer filed suit against the Foundation and Spain in the Central District of California. On February 28, 2006, the Foundation filed a motion to dismiss, contending that the district court lacked subject matter and personal jurisdiction and that venue did not lie in the Central District of California. While the Foundation's motion was pending, Cassirer moved the court for leave to conduct jurisdictional discovery.

On April 5, 2006, the district court reviewed, as a question of law, whether the expropriation exception to sovereign immunity in § 1605(a)(3) of the FSIA applied to a sovereign entity that was not alleged to have taken property in violation of international law. After receiving further briefing from the parties, the district court ruled that § 1605(a)(3) requires only that property was seized in violation of international law, not that the foreign sovereign itself violated international law. The district court also granted sixty days to conduct discovery for the purpose of determining whether the Foundation conducted "commercial activity in the United States within the meaning of the FSIA."

On June 9, 2006, Spain filed its own motion to dismiss, contending lack of subject matter jurisdiction due to sovereign immunity and various other grounds. On August 30, 2006,

---

[5]Claude Cassirer is a United States citizen and resident of California.

after hearing argument, the district court issued a Memorandum and Order denying both the motions to dismiss. The district court held that 1) Cassirer presented a case or controversy against both the Foundation and Spain; 2) Cassirer was not required to exhaust judicial remedies; 3) § 1605(a)(3) of the FSIA applies to the Foundation and Spain, despite Cassirer's admission that neither took the Painting in violation of international law (affirming its earlier decision on this point); 4) the Foundation and Spain engage in commercial activity in the United States within the meaning of § 1605(a)(3), such that they are not entitled to sovereign immunity; 5) under the language of the FSIA, personal jurisdiction exists over the Foundation and Spain by virtue of the fact that subject matter jurisdiction existed; and 6) venue is proper in the Central District of California. *See Cassirer v. Kingdom of Spain*, 461 F. Supp. 2d 1157 (C.D. Cal. 2006).

The Appellants brought this timely interlocutory appeal. Cassirer subsequently filed a Motion to Dismiss, contending that this court lacks appellate jurisdiction over any issues other than whether the Appellants are entitled to sovereign immunity.

## II.    **Jurisdiction**.

We first address the issue of appellate jurisdiction raised by Cassirer. We have jurisdiction to review "final decisions" of the district court. 28 U.S.C. § 1291. "Final decisions end the litigation on the merits and leave nothing for the court to do but execute the judgment." *Am. States Ins. Co. v. Dastar Corp.*, 318 F.3d 881, 884 (9th Cir. 2003) (internal quotations and alterations omitted). Typically, a district court's denial of a motion to dismiss is not final for purposes of 28 U.S.C. § 1291. *See Marx v. Government of Guam*, 866 F.2d 294, 296 (9th Cir. 1989). Under the "collateral order doctrine," we may nonetheless review that "small category of decisions" that are "conclusive [because they] resolve important questions separate from the merits, and that are effectively unreviewable on

appeal from the final judgment in the underlying action." *Swint v. Chambers County Comm'n*, 514 U.S. 35, 42 (1995) (citation omitted).

[1] "[T]he denial of a claim of lack of [personal] jurisdiction is not an immediately appealable collateral order." *Van Cauwenberghe v. Biard*, 486 U.S. 517, 526-27 (1988); *Batzel v. Smith*, 333 F.3d 1018, 1023 (9th Cir. 2003) (orders denying motions to dismiss for lack of personal jurisdiction are not final and are not appealable under the collateral order doctrine). Therefore, we do not have jurisdiction to review the district court's denial of Appellants' motions to dismiss for lack of personal jurisdiction, and we dismiss this appeal with regard to that issue.

[2] Likewise, we dismiss the appeal with regard to the issues of standing and Article III case or controversy. The district court's order denying Appellants' motion to dismiss on these issues is fully reviewable on appeal from a final judgment. Therefore, we hold that such a denial is not immediately appealable as a collateral order.[6] *See Swint*, 514 U.S. at 42 (to be immediately appealable under collateral order doc-

---

[6]*See also, e.g.*, *Moniz v. City of Ft. Lauderdale*, 145 F.3d 1278, 1281 n.3 (11th Cir. 1998) (question of standing is not a final decision under the collateral order doctrine); *Triad Assocs., Inc. v. Robinson*, 10 F.3d 492, 496-97 n.2 (7th Cir. 1993) (denial of a motion to dismiss for lack of standing does not qualify as a final judgment and is not immediately appealable); *Crymes v. DeKalb County, Ga.*, 923 F.2d 1482, 1484 (11th Cir. 1991) (observing that denial of motion to dismiss on ripeness grounds is not immediately appealable); *Shanks v. City of Dallas*, 752 F.2d 1092, 1099 n.9 (5th Cir. 1985) (case or controversy considerations are not appealable under the collateral order exception because they obviously "involve considerations that are emeshed in the legal issues surrounding [the merits of the] cause of action"); *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 474-75 (2d Cir. 1974) (question of ripeness and standing are not immediately appealable under collateral order doctrine), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000).

trine, decision must be effectively unreviewable on appeal from the final judgment in the underlying action).[7]

We have jurisdiction to review the district court's order as it pertains to sovereign immunity. "[A]n order denying immunity under the FSIA is appealable under the collateral order doctrine," because sovereign immunity is immunity from suit, which is effectively lost if a case is erroneously permitted to go to trial. *Gupta*, 487 F.3d at 763, 764 n.6.

## III.    Sovereign Immunity Under the FSIA.

The primary issue before us is whether Appellants are entitled to sovereign immunity under the FSIA, such that the district court lacks subject matter jurisdiction. The existence of subject matter jurisdiction under the FSIA is a question of law reviewed de novo. *Adler v. Fed. Republic of Nigeria*, 107 F.3d 720, 723 (9th Cir. 1997). A district court's factual findings on jurisdictional issues are reviewed for clear error. *Id*.

---

[7]In *Swint*, the Supreme Court left open the possibility that we might exercise pendent appellate jurisdiction when we properly have jurisdiction over one ruling and "related rulings that are not themselves independently appealable" are "inextricably intertwined," or when review of the related ruling is "necessary to ensure meaningful review of the [issue over which the court has jurisdiction]," *Swint*, 514 U.S. at 50-51, and we have done so under some circumstances. *See Idaho Watersheds Project v. Hahn*, 307 F.3d 815, 824 (9th Cir. 2002); *Hook v. Ariz. Dep't of Corr.*, 107 F.3d 1397, 1401-02 (9th Cir. 1997). We decline to do so here, however. Whether Appellants are "persons" within the meaning of the Due Process Clause for purposes of personal jurisdiction is not inextricably intertwined with our determination of sovereign immunity. Likewise, whether the case involves a case or controversy against Spain does not relate to or necessarily involve our consideration of sovereign immunity. Further, because we can resolve the sovereign immunity issue without reaching the merits of Appellants' challenge to Article III case or controversy and standing, we do not exercise pendent appellate jurisdiction under Swint. Accordingly, we dismiss this appeal as to these issues.

### A.  The FSIA Provides Limited Exceptions to Sovereign Immunity.

[3] The district court has original jurisdiction of any non-jury civil action against a foreign state, including its agencies and instrumentalities.[8] *See* 28 U.S.C. § 1330(a). Under the FSIA, however, foreign states are immune from the jurisdiction of United States courts, subject only to the specific exceptions in §§ 1605, 1607, and specified existing international agreements. *See id.* at § 1604.[9] Thus, the sole basis for obtaining jurisdiction over a foreign state in federal court is the existence of an exception to the FSIA. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989). The FSIA exceptions include "waiver of immunity, § 1605(a)(1), commercial activities occurring in the United States or causing a direct effect in this country, § 1605(a)(2), property expropriated in violation of international law, § 1605(a)(3), inherited, gift, or immovable property located in the United States, § 1605(a)(4), non-commercial torts occurring in the United States, § 1605(a)(5), and maritime liens, § 1605(b)." *Id.*

### B.  The Expropriation Exception.

[4] Cassirer contends that neither the Foundation nor Spain is entitled to sovereign immunity due to the "expropriation exception" of § 1605(a)(3).[10] Section 1605(a)(3) provides that

---

[8]Section 1603(a) defines "foreign state" to include "a political subdivision of a foreign state or an agency or instrumentality of a foreign state . . ."

[9]Section 1604 provides: "Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter." 28 U.S.C. § 1604.

[10]Section 1605(a)(3) provides: "A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any

a "foreign state shall not be immune . . . in any case . . . in which rights in property taken in violation of international law are in issue . . . ." The issue regarding the applicability of this exception arises because the statute uses the passive voice and does not expressly require that the foreign state (against whom the claim is made) be the entity that took the property in violation of international law. Appellants invite us to read such a requirement into the statute. The parties agree that Germany, and not Spain, allegedly took the Painting in violation of international law. Therefore, under the construction urged by Appellants, the expropriation exception could not apply. We disagree.

**[5]** We find § 1605(a)(3) to be unambiguous. Where "the intent of Congress is clear and unambiguously expressed by the statutory language," that is normally the end of the statutory analysis. *Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ.*, 550 U.S. 81, 93 (2007). We hold that the plain language of § 1605(a)(3) does not require that the foreign state (against whom the claim is made) be the entity who expropriated the property in violation of international law.

**[6]** Our holding is consistent with the legislative history.[11] In reviewing Congress's intent in enacting the FSIA, we con-

---

case . . . in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States." 28 U.S.C. § 1605(a)(3).

[11]Under appropriate circumstances, we may consider legislative history even when the plain language is clear. We do this, however, only where the legislative history "*clearly* indicates that Congress meant something other than what it said." *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 877 (9th Cir. 2001) (emphasis added).

sider § 1602, which sets forth Congress's findings and purpose. This section expresses Congress's understanding that foreign states are not immune from suit "insofar as their commercial activities are concerned."[12] In explaining § 1602, the House Report states that Congress is adopting the restrictive theory of sovereign immunity, that is, "[T]he sovereign immunity of foreign states should be 'restricted' to cases involving acts of a foreign state which are sovereign or governmental in nature, as opposed to acts which are either commercial in nature or those which private persons normally perform." H.R. Rep. No. 94-1487, at 14 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6613.

**[7]** Consistent with the restrictive theory of sovereign immunity described in § 1602 and the House Report, the exceptions in § 1605(a) apply to situations in which foreign states act more like private persons or are engaged in commercial activities. The plain language of § 1605(a)(3) is entirely consistent with Congress's intent, because § 1605(a)(3) gives a court jurisdiction over a foreign state in cases involving stolen property only if the foreign state (or its agency) is engaged in a commercial activity in the United States.

---

[12]In its statement of "Findings and declaration of purpose," 28 U.S.C. § 1602 provides:

> The Congress finds that the determination by United States courts of the claims of foreign states to immunity from the jurisdiction of such courts would serve the interests of justice and would protect the rights of both foreign states and litigants in United States courts. Under international law, states are not immune from the jurisdiction of foreign courts insofar as their commercial activities are concerned, and their commercial property may be levied upon for the satisfaction of judgments rendered against them in connection with their commercial activities. Claims of foreign states to immunity should henceforth be decided by courts of the United States and of the States in conformity with the principles set forth in this chapter.

Citing *In re Republic of Philippines*, 309 F.3d 1143 (9th Cir. 2002), Appellants argue that § 1605(a)(3) applies only when the foreign state against whom the claim is leveled actually took property in violation of international law. *Republic of Philippines* required us to interpret the exception in § 1605(a)(4), which provides that a foreign state loses its immunity in any case "in which rights in property in the United States acquired by succession or gift or rights in immovable property situated in the United States are in issue." We construed the statute as applying only to rights in property in the United States acquired by succession or gift *by the foreign state*. In reaching this conclusion, we relied on language in the House Report which stated:

> There is general agreement that a foreign state may not claim immunity when the suit against it relates to rights in property, real or personal, obtained by gift or inherited by the foreign state and situated or administered in the country where the suit is brought . . . The reason is that, in claiming rights in a decedent's estate or obtained by gift, *the foreign state claims the same right which is enjoyed by private persons*.

*Republic of Philippines*, 309 F.3d at 1151 (quoting H.R. Rep. No. 94-1487) (emphasis added). In other words, to effectuate Congress's intent to grant courts jurisdiction over foreign states only when they act more like private persons, we read "by the foreign state" into § 1605(a)(4). Under this reading, courts gain jurisdiction over a foreign state only if the state acted like a private person and by claiming rights in a decedent's estate or obtaining a gift. Contrary to Appellant's argument, our interpretation of § 1605(a)(4) in *Republic of Philippines* is entirely consistent with a plain language reading of § 1605(a)(3). It is not necessary to read "by the foreign state" into § 1605(a)(3) to achieve consistency with the restrictive theory of sovereign immunity. The plain language of § 1605(a)(3) already grants courts jurisdiction over foreign

states only if they act like a private person by engaging in commercial activities. *Republic of Philippines* therefore provides no justification to depart from the plain language of § 1605(a)(3).

[8] Because nothing in the plain language of the FSIA or the legislative history requires us to read additional language into the statute, we hold that the expropriation exception to sovereign immunity found in § 1605(a)(3) does not require that the foreign state against whom the claim is made be the foreign state that took property in violation of international law.

## C.   Commercial Activity in the United States.

[9] For the expropriation exception to apply, the FSIA also requires "that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States." 28 U.S.C. § 1605(a)(3). The Foundation admits that it is an "agency or instrumentality" of Spain and that it owns the Painting. We agree with the district court that the Foundation has engaged in sufficient commercial activity in the United States to satisfy § 1605(a)(3).

As defined in the FSIA, "commercial activity"

> means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

28 U.S.C. § 1603(d). "The central question is whether the activity is of a kind in which a private party might engage."

*Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 708 (9th Cir. 1992) (internal quotation marks omitted).

In *Siderman*, we concluded that Argentina conducted commercial activity in the United States, because (1) it advertised an expropriated hotel in the United States; (2) it solicited guests through its United States agent (Argentina's national airline); (3) numerous Americans stayed at the hotel; and (4) the hotel accepted all major American credit cards. *Id.* at 712-13.

Likewise, in *Altmann*, we concluded that authoring, promoting, and distributing books and other publications in the United States to exploit expropriated paintings were "sufficient to constitute 'commercial activity' for the purpose of satisfying the FSIA." *Altmann*, 317 F.3d at 959.

In this case, after allowing limited jurisdictional discovery, the district court found that the Foundation engaged in commercial transactions in the United States, including transacting business as a purchaser and a seller of goods and services and as an advertiser in distributing marketing and other commercial promotional materials. *Cassirer v. Kingdom of Spain*, 461 F. Supp. 2d 1157, 1173-75 (C.D. Cal. 2006). For example, the Foundation made numerous purchases of books, posters, post cards, and related materials from United States businesses in New York, California, and Washington, D.C. The Foundation also purchased books about Nazi expropriation of great works of art[13] and a book presumably about the works of Pissaro. *Id.* at 1173. The Foundation sold posters and books to United States residents and businesses, and

---

[13]The district court noted, "As particularly ironic examples, the Foundation purchased through Amazon.com *The Lost Museum: The Nazi Conspiracy to Steal the World's Greatest Works of Art*, . . . and from the American Association of Museums in Washington, DC purchased a volume on *Museum Policy and Procedure for Nazi Era Issues*." *Cassirer*, 461 F. Supp. 2d at 1173 (internal citations omitted).

licensed the reproduction of images to various United States businesses. *Id.* The Foundation also admitted that it worked with U.S. entities to secure goods to be sold in the Museum gift shop, including paying U.S. citizens to write for its exhibit catalogs. *Id.* Further, it admitted that it has shipped gift shop items to purchasers in the United States. *Id.* Notably, the Foundation sold a poster of the Painting at issue in this case to individuals in both California and North Carolina. The California purchaser resides in the Central District of California and used her American Express credit card to consummate the transaction. *Id.*

The Foundation also solicited, recruited, and commissioned writers and speakers from the United States to provide services at the Museum. *Id.* The Foundation facilitated the production of a film on the Foundation collection, featuring the Painting, which it knew would be presented in-flight on Iberia Airlines flights to and from the United States. *Id.* at 1174.

The Foundation placed advertisements in magazines that are distributed in the United States and sent press releases, brochures, and general information to TourEspaña and the Spanish National Tourist Offices in the United States. For example, the Foundation advertised in news publications such as *Newsweek*, *Time Magazine*, and the *New Yorker*. *Id.* It also distributes its Museum bulletin, "Perspectives," to individuals in the United States, including two in the Central District of California. *Id.*

The Foundation also contracted with museums in the United States to loan its artwork to the U.S. institutions or to borrow artwork for display in the Foundation Museum in Spain. *Id.* at 1174-75.

[10] The record supports the district court's factual findings, which are not clearly erroneous. Cassirer has produced numerous examples of the Foundation's commercial activity in the United States that are "of a kind in which a private

party might engage." *Siderman*, 965 F.2d at 708 (internal quotation marks omitted). Much of that activity was connected with the Painting. Thus, Cassirer has adequately demonstrated that the Foundation has engaged in sufficient commercial activity in the United States to satisfy § 1605(a)(3).

## IV.  **Exhaustion of Remedies**.

**[11]** Cassirer unsuccessfully petitioned the Foundation for return of the Painting, but Cassirer has not alleged that he made recourse to the Spanish or German judiciaries to settle his claim to the Painting.[14] Thus, Spain argues that § 1605(a)(3) cannot apply, because Cassirer has not exhausted judicial remedies in the foreign forum. The district court held that the plain language of § 1605(a)(3) of the FSIA contains no "exhaustion-of-foreign-remedies requirement" and therefore the court refused to impose such a requirement on Cassirer. *Cassirer*, 461 F. Supp. 2d at 1164. Whether the FSIA, specifically § 1605(a)(3), requires exhaustion is a matter of statutory interpretation and an issue of first impression.

"Of paramount importance to any exhaustion inquiry is congressional intent." *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992) (citing *Patsy v. Board of Regents of Florida*, 457 U.S. 496, 501 (1982) (internal quotation marks omitted)), *superceded by statute as stated in Booth v. Churner*, 532 U.S. 731, 732 (2001).[15] "Where Congress specifically mandates,

---

[14]The record does not indicate what, if any, judicial actions have been brought in Germany. We note that there is some indication in publicly available material that, in 1958, the West German government may have acknowledged Lilly Cassirer to be the legal owner of the Painting, conceding that she retained the full rights of ownership. *See* Emma Daly, *American Says Painting in Spain is Holocaust Loot*, N.Y. Times, Feb. 10, 2003, at E1.

[15]Although these decisions generally involve the exhaustion of administrative remedies, we have previously approached exhaustion of claims invoking international law in a manner consistent with our application of exhaustion in other domestic contexts. *See Sarei*, 550 F.3d at 831-32 ("[E]xhaustion under the [Alien Torts Statute] should be approached consistently with exhaustion principles in other domestic contexts.").

exhaustion is required." *Id.* (citing *Coit Independence Joint Venture v. FSLIC*, 489 U.S. 561, 579 (1989); *Patsy*, 457 U.S. at 502 n.4). "But where Congress has not clearly required exhaustion, sound judicial discretion governs." *McCarthy*, 503 U.S. at 144 (citing *McGee v. United States*, 402 U.S. 479, 483 n.6 (1971)). To discern the intent of Congress, " '[w]e look first to the plain language of the statute, construing the provisions of the entire law, including its object and policy.' " *United States v. $493,850.00 in U.S. Currency*, 518 F.3d 1159, 1167 (9th Cir. 2008) (quoting *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 877 (9th Cir. 2001)).

[12] As the district court noted, the FSIA is silent as to any exhaustion requirement. The legislative history is also devoid of any enlightening reference to exhaustion.[16] Accordingly,

---

[16]Cassirer's argument that Congress's prior inclusion of an arbitration requirement in § 1605(a)(7)(B)(i) evidences an intent to exclude an exhaustion requirement from § 1605(a)(3) is not persuasive. A mandatory arbitration requirement, although similar, is not the same as an exhaustion-of-local-remedies requirement. The phrase "local remedies" has been "interpreted broadly, [to include] the whole system of legal protection, as provided by municipal law, not only the courts and tribunals but also the use of procedural facilities which municipal law makes available to litigants." Restatement (Third) of Foreign Relations Law § 713, Reporters' Note 5 (citing *Ambatielos Case (Greece v. United Kingdom)*, 1951, 12 R. Int'l Arb. Awards 91, 120, 122) (internal quotation marks omitted). Therefore, one might fulfil an arbitration requirement without exhausting local remedies.

Further, § 1605(a)(7)(B)(i) was enacted approximately twenty years after § 1605(a)(3). Thus, the *exclusio unius* doctrine does not apply. *See Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 520 (1992) (noting that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one") (internal quotation marks omitted). For this reason, we disagree with the D.C. Circuit's suggestion that the inclusion of § 1605(a)(7)(B)(i) "strengthens the inference that its omission from a closely related section must have been intentional." *Agudas Chasidei Chabad v. Russian Fed'n*, 528 F.3d 934, 948 (D.C. Cir. 2008) (suggesting, but not deciding, that § 1605(a)(3) does not impose an exhaustion requirement).

Congress has since repealed the arbitration requirement of § 1605(a)(7). *See* National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, div. A, § 1083(b)(1)(A)(iii), 122 Stat. 3, 341 (2008) (repealing 28 U.S.C. § 1605(a)(7)).

we hold that Congress has not clearly required exhaustion for claims brought under the FSIA. This, however, does not end our analysis.

To determine whether an action brought against a foreign state (invoking an exception to the FSIA) requires exhaustion, it is important to put into context what the FSIA is and what it is not. The FSIA is not a source of substantive law and does not create any causes of actions. Rather, it is a jurisdictional statute incorporating international law principles to guide U.S. courts in determining when a foreign state is or is not entitled to sovereign immunity. *See* § 1602. In other words, claims brought in U.S. courts, against foreign states, for violations of international law depend on the applicability of an exception to the FSIA for jurisdiction. Such claims, however, depend on the law of nations to define the substantive rights embodied in any cause of action. The Supreme Court has similarly recognized the Alien Tort Statute (ATS), 28 U.S.C. § 1350, to be a jurisdictional statute that creates no new causes of action and relies on the common law and the present-day law of nations to define substantive rights. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 724 (2004) ("[T]he ATS is a jurisdictional statute creating no new causes of action . . .").[17]

**[13]** The doctrine of exhaustion of domestic remedies is a "well-established rule of customary international law." *See Sarei*, 550 F.3d at 829 (quoting *Interhandel Case (Switz. v. U.S.)*, 1959 I.C.J. 6, 26 (Mar. 29)). This rule generally provides that a state is not required to consider a claim, made by a person against a foreign state, and alleging a violation of international law "until that person has exhausted domestic remedies, unless such remedies are clearly sham or inadequate, or their application is unreasonably prolonged." *See*

---

[17]The ATS provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350.

*Sarei*, 550 F.3d at 829 (citing Restatement (Third) of Foreign Relations Law § 713 cmt. f & § 703 cmt. d)). Because United States courts import well-settled principles of international law to define substantive rights in cases brought under the FSIA, there are logical arguments suggesting that courts should also import the well-settled limitations to such causes of action, including the doctrine of exhaustion of remedies. *Cf. Sarei*, 550 F.3d at 833-35 (Bea, J., concurring) (discussing exhaustion in the context of the ATS); *Sarei*, 487 F.3d at 1231-45 (Bybee, J., dissenting) (same). Nonetheless, where Congress has not clearly required exhaustion, we have not (and likely cannot) impose exhaustion as an absolute jurisdictional requirement. *See Sarei*, 550 F.3d at 824 ("[W]e decline to impose an absolute requirement of exhaustion in ATS cases."). *See also Sampson v. Federal Republic of Germany*, 250 F.3d 1145, 1153-54 (7th Cir. 2001) ("[A]lthough international law is 'part of our law,' it does not follow that federal statutes must be read to reflect the norms of international law.") (citation omitted).

The jurisdiction of federal courts derives from and is circumscribed exclusively by Article III of the United States Constitution and by federal statutes enacted by Congress. *See Karcher v. May*, 484 U.S. 72, 77 (1987) ("The power of federal courts to hear and decide cases is defined by Article III of the Constitution and by the federal statutes enacted thereunder."); *Sheldon v. Sill*, 49 U.S. (8 How.) 441, 448-49 (1850) ("Congress, having the power to establish the courts, must define their respective jurisdictions. . . . Courts created by statute can have no jurisdiction but such as the statute confers."). In the domestic context, we have acknowledged that statutory exhaustion requirements are jurisdictional in nature. *See Sarei*, 550 F.3d at 828 & n.6 (gathering cases).[18] Where

---

[18]*See, e.g.*, *Coit Independence Joint Venture v. FSLIC*, 489 U.S. 561, 579 (1989) (establishing that "exhaustion of administrative remedies is required where Congress imposes an exhaustion requirement by statute"); *Weinberger v. Salfi*, 422 U.S. 749, 764-67, 95 S.Ct. 2457, 45 L.Ed.2d 522

Congress requires exhaustion, a failure to exhaust available remedies typically deprives the federal court of jurisdiction. Such is not necessarily the case, however, when international norms, and not Congress, purport to circumscribe jurisdiction by requiring exhaustion of remedies. International law may define the substantive rights of parties in actions permitted by the FSIA, but it cannot compel or restrict Article III jurisdiction. *Cf. Sampson*, 250 F.3d at 1152 ("[I]nternational law itself does not mandate Article III jurisdiction over foreign sovereigns."). Absent clear Congressional intent, we cannot incorporate exhaustion as an absolute requirement merely because international law would require it. An absolute exhaustion requirement amounts to an absolute limitation on the jurisdiction of federal courts. To impose such a requirement would, in essence, usurp the Constitutional power vested in Congress and cede foreign lawmakers and jurists with power to limit the jurisdiction of United States federal courts.

**[14]** Neither Congress nor this court have imposed an absolute exhaustion of remedies requirement in cases brought against foreign states under an exception to the FSIA. Yet, where principles of international comity and rules of customary international law require exhaustion, we exercise sound judicial discretion and consider exhaustion on a prudential, case-by-case basis. *See Sarei*, 550 F.3d at 828. *In Sarei*, we

(1975) (holding 42 U.S.C. § 405(h) of the Social Security Act contains a jurisdictional exhaustion requirement); *Barron v. Ashcroft*, 358 F.3d 674, 677 (9th Cir. 2004) (holding that exhaustion of administrative remedies under 8 U.S.C. § 1252(d)(1) is a jurisdictional requirement, and failure to exhaust deprives the court of subject-matter jurisdiction); *Platte River Whooping Crane Critical Habitat Maint. Trust v. FERC*, 876 F.2d 109, 112-13 (D.C. Cir. 1989) (interpreting Federal Power Act statute, 16 U.S.C. § 825/(b), to provide a jurisdictional exhaustion requirement); *Dhangu v. INS*, 812 F.2d 455, 460 (9th Cir. 1987) (stating that exhaustion of administrative remedies with the BIA is a jurisdictional requirement); *Lindsey v. U.S.*, 448 F. Supp. 2d 37, 51 (D.D.C. 2006) (interpreting provision of the Internal Revenue Code, 26 U.S.C. § 7422(a), as imposing a jurisdictional exhaustion requirement).

held that domestic prudential standards and core principles of international law require a district court to consider exhaustion in appropriate cases. *Id.* at 824 (citing *Sosa*, 542 U.S. at 733 n.21).[19] Under our prudential approach, when a defendant affirmatively pleads failure to exhaust remedies, the district court must, as a discretionary matter, determine in the first instance whether to impose such a requirement on a plaintiff. *Id.* at 832.

[15] Although *Sarei* addressed exhaustion in the context of the ATS, where Congress has not clearly adopted or rejected exhaustion as a jurisdictional prerequisite, our formulation of prudential exhaustion applies equally to cases brought against foreign states (and their instrumentalities) under the FSIA.[20] In this case, Appellants have asserted that Cassirer failed to exhaust available remedies in Spain or Germany. Although the district court correctly concluded that the FSIA does not

---

[19]Justice Breyer, joined by Justice Souter, indicated, in dicta, that they would likely read § 1605(a)(3) to require exhaustion. Concurring in *Republic of Austria v. Altmann*, Justice Breyer wrote "a plaintiff may have to show an absence of remedies in the foreign country sufficient to compensate for any taking. . . . A plaintiff who chooses to litigate in this country in disregard of the postdeprivation remedies in the expropriating state may have trouble showing a tak[ing] in violation of international law." *Republic of Austria v. Altmann*, 541 U.S. 677, 714 (2004) (Breyer, J., concurring) (internal quotation marks omitted).

[20]We respectfully disagree with the concurring-and-dissenting opinion's conclusion that *Sarei* is not on point. As in *Sarei*, the substantive claims here are based on alleged violations of international law. Both the ATS (at issue in *Sarei*) and the FSIA are jurisdictional statutes, and Congress has not expressly required or rejected exhaustion in either. With regard to principles of prudential exhaustion, the only meaningful difference between the international tort claims in *Sarei* and the claims made in the present case (and the only reason the FSIA is at issue) is that the defendant here is a sovereign foreign state. That is, if the defendant here were a private party, there could be little doubt that *Sarei* would apply. That the defendant is a foreign state does not undermine the applicability of *Sarei*. Rather, that fact and the principles of international comity weigh strongly in favor of the district court's consideration of exhaustion of local remedies on a prudential basis.

require exhaustion of remedies, the court erred by failing to conduct a prudential exhaustion analysis.[21]

On remand, the district court should be guided by the principles we outlined in *Sarei*. Summarizing the *Sarei* framework generally, we first note that the district court need only consider exhaustion to the extent the defendant has affirmatively pleaded Cassirer's failure to exhaust local remedies. *See Sarei*, 550 F.3d at 832 ("The defendant bears the burden to plead and justify an exhaustion requirement, including the availability of local remedies.") (citation omitted). Second, the court must consider whether Congress has clearly required exhaustion for the specific claims asserted in the complaint. If, as in this case, Congress has not imposed or rejected such a requirement, the court must then determine whether the applicable substantive law would require exhaustion.[22] Third, the court must consider whether the defendant has met its burden to show the availability of local remedies and that such remedies have not been exhausted. *Id.* The plaintiff may rebut a showing of unexhausted remedies abroad by demonstrating the futility of exhaustion ("by showing that the local remedies were ineffective, unobtainable, unduly prolonged, inadequate,

---

[21]Contrary to the concurring-and-dissenting opinion's assertion, we are not writing an absolute exhaustion requirement into the FSIA. Nor are we absolutely precluding an exhaustion requirement where one might ordinarily be required by the applicable international law and justified under the circumstances. We do not hold that the district court must impose an exhaustion requirement in this case. Rather, we direct the district court (in the absence of clear Congressional intent otherwise) to examine the record before it, the applicable substantive law, and various equitable factors and then to carefully weigh whether to require exhaustion of local remedies on the claims before it. Where Congress has neither clearly imposed or rejected exhaustion as a prerequisite to exercising jurisdiction against a foreign state, the district court has discretion to consider exhaustion on a prudential basis. *See Sarei*, 550 F.3d at 828.

[22]Although exhaustion is, generally, a well-established rule of international law, it may not be firmly established in all areas of international law. *See Sarei*, 550 F.3d at 844 (Reinhardt, J., dissenting) (discussing exhaustion in the context of international human rights).

or obviously futile."). *Id.* (citations omitted). Finally, the court may, in its sound discretion, impose or waive exhaustion after assessing the availability, effectiveness, and possible futility of any unexhausted remedies in light of various prudential factors, including but not limited to: (1) the need to safeguard and respect the principles of international comity and sovereignty, (2) the existence or lack of a significant United States "nexus,"[23] (3) the nature of the allegations and the gravity of the potential violations of international law, and (4) whether

---

[23]The concurring-and-dissenting opinion would limit the reach of *Sarei* by suggesting that prudential exhaustion applies only in cases where there is a weak nexus with the United States. Therefore, the concurring-and-dissenting opinion suggests that, if an FSIA exception to sovereign immunity applies, then prudential exhaustion should not be considered because the claim necessarily has a strong nexus with the United States. We respectfully disagree. First, we do not read *Sarei* to hold that exhaustion may *only* be considered where there is a weak nexus to the United States. As we explained in *Sarei*, "The lack of a significant U.S. 'nexus' is an *important* consideration in evaluating whether plaintiffs should be required to exhaust their local remedies in accordance with the principle of international comity." *Sarei*, 550 F.3d at 831 (emphasis added). That is, courts should "carefully consider the question of exhaustion," particularly where the nexus is weak and where the claims "do not involve matters of 'universal concern.' " *See id.*

Second, some of the exceptions to sovereign immunity under the FSIA require little (if any) nexus with the United States. *See, e.g.*, § 1605(a) (1) (exception to sovereign immunity where there is an explicit or implicit waiver of immunity by the foreign state); § 1605(a)(6) (exception to sovereign immunity for actions to enforce an agreement made by the foreign state with or for the benefit of a private party to submit to arbitration); § 1605(b) (exception to sovereign immunity for a suit in admiralty brought to enforce a maritime lien against a vessel or cargo of the foreign state which maritime lien is based upon a commercial activity of the foreign state). *But see, e.g.*, §§ 1605(a)(2)-(5) (generally requiring that the foreign state have engaged in some commercial activity within or having direct impact in the United States). Thus, we cannot say that a claim's nexus with the United States is necessarily strong any time an exception to sovereign immunity applies. In some cases, a relatively isolated or weak nexus may be sufficient to subject a foreign state to jurisdiction. Yet a weak nexus may also weigh in favor of requiring exhaustion of local remedies in the appropriate case.

the allegations implicate matters of "universal concern" for which a state has jurisdiction to adjudicate the claims without regard to territoriality or the nationality of the parties. *See id.* at 830-31.

## V.    Conclusion.

**[16]** We dismiss this appeal with regard to the issues of personal jurisdiction, standing, and Article III case or controversy. We affirm the district court with regard to its statutory interpretation of 28 U.S.C. § 1605(a)(3). We likewise affirm the district court's conclusion that the Foundation engaged in sufficient commercial activity within the United States to satisfy the requirements of § 1605(a)(3). We reverse the district court, however, with regard to exhaustion of remedies and we remand for the limited purpose to determine in the first instance whether to impose an exhaustion requirement on Cassirer.

**AFFIRMED in part**, **REVERSED in part**, and **REMANDED**.

Each party shall bear its own cost.

---

IKUTA, J., concurring in part and dissenting in part:

I concur in Sections I, II and III. I disagree with Section IV, however, because in my view we should not take it upon ourselves to write an exhaustion requirement into the Foreign Sovereign Immunities Act ("FSIA") when Congress has chosen not to. In enacting the FSIA, Congress created uniform and clear standards for litigants seeking to bring lawsuits against foreign sovereigns, and there is no indication that Congress contemplated that courts would impose an additional exhaustion requirement on litigants. Moreover, our case law on prudential exhaustion in the context of the Alien Tort

Statute ("ATS") is both inapposite and non-binding. Because imposing a judge-made exhaustion requirement here is contrary to Congressional intent and does nothing more than create a trap for the unwary, I respectfully dissent.

I

As always, we begin with the plain language of the statute. *Prince v. Jacoby*, 303 F.3d 1074, 1079 (9th Cir. 2002). As the majority acknowledges, the FSIA does not include an exhaustion requirement. Maj. Op. at 12711-12.

Nor is there any evidence that Congress intended to require plaintiffs to exhaust their remedies in a foreign nation before bringing suit under the FSIA. To the contrary, as explained below, the history of the FSIA indicates that Congress intended to create a comprehensive scheme governing lawsuits in federal courts against a foreign sovereign that would establish once and for all a plaintiff's rights, thereby eliminating inconsistency and uncertainty.

Before the enactment of the FSIA, federal courts "deferred to the decisions of the political branches—in particular, those of the Executive Branch—on whether to take jurisdiction over actions against foreign sovereigns and their instrumentalities." *Verlinden B.V. v. Cent. Bank of Nig.*, 461 U.S. 480, 486 (1983) (citing *The Schooner Exchange v. M'Faddon*, 7 Cranch 116 (1812)). Before 1952, the Executive Branch generally asked federal courts to recognize the sovereign immunity of friendly sovereigns in all lawsuits. *Id.* In 1952, however, the State Department changed course, and announced that the Executive Branch had adopted the "restrictive theory" of sovereign immunity,[1] under which the Executive Branch would request courts to recognize sover-

---

[1]*See* Letter from Jack B. Tate, Acting Legal Adviser, Department of State, to Acting Attorney General Philip B. Perlman (May 19, 1952), *reprinted in* 26 Dep't of State Bull. 984-85 (1952).

eign immunity only in "suits involving the foreign sovereign's public acts," and not in "cases arising out of a foreign state's strictly commercial acts." *Id.* at 487.

Judicial application of the restrictive theory "proved troublesome" however. *Id.* Foreign sovereigns often put diplomatic pressure on the State Department to recommend that courts recognize sovereign immunity in cases not fitting the restrictive theory, and the Executive Branch's involvement in judicial immunity determinations proved inconsistent. *Id.* These problems resulted in a lack of uniform, predictable standards regarding when federal courts would exercise jurisdiction in lawsuits against foreign sovereigns. *See id.* at 487-88; *see also Republic of Austria v. Altmann*, 541 U.S. 677, 690-91 (2004).

Seeking to remedy these problems, Congress passed the FSIA in 1976. *Id.* at 691. The statute's purpose was "to free the Government from the case-by-case diplomatic pressures, to clarify the governing standards, and to assure litigants that decisions are made on purely legal grounds and under procedures that insure due process." *Verlinden*, 461 U.S. at 488 (internal quotation marks omitted) (citing H.R. REP. NO. 94-1487, at 7 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6605).

The FSIA "codif[ied], as a matter of federal law, the restrictive theory of sovereign immunity," and created "a comprehensive set of legal standards governing claims of immunity in every civil action against a foreign state or its political subdivisions, agencies, or instrumentalities." *Id.* Section 2 of the FSIA added § 1330(a) to Title 28, thereby conferring on federal courts subject matter jurisdiction "as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title or under any applicable international agreement." 28 U.S.C. § 1330(a) (2006).[2] Section 1604 pro-

---

[2]The full text of § 1330(a) states:

The district courts shall have original jurisdiction without regard

vides foreign sovereigns with a presumption of immunity,[3] and §§ 1604 and 1330(a) "work in tandem: § 1604 bars federal and state courts from exercising jurisdiction when a foreign state *is* entitled to immunity, and § 1330(a) confers jurisdiction on district courts to hear suits brought by United States citizens and by aliens when a foreign state is *not* entitled to immunity" by operation of an exception in §§ 1605 to 1607. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). The exceptions to immunity in §§ 1605 to 1607 (including actions based on specified commercial activities, rights in personal and real property under certain conditions, and enforcement of certain agreements, among others) generally require "some form of substantial contact with the United States." *Verlinden*, 461 U.S. at 490 (citing 28 U.S.C. § 1605).

If a foreign state is not entitled to sovereign immunity under the FSIA, it is treated like any other private individual litigant (with the exception that punitive damages are unavailable),[4] because the state is acting as a private party rather than a sovereign exercising power over its own citizens. *See Republic of Arg. v. Weltover, Inc.*, 504 U.S. 607, 614 (1992) ("A foreign state engaging in 'commercial' activities does not

---

to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title or under any applicable international agreement.

28 U.S.C. § 1330(a).

[3]28 U.S.C. § 1604 (2006) states:

Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.

[4]*See* 28 U.S.C. § 1606 (2006).

exercise powers peculiar to sovereigns; rather, it exercises only those powers that can also be exercised by private citizens." (internal quotation marks and alterations omitted)); *see also Permanent Mission of India to the U.N. v. City of New York*, 551 U.S. 193, 200-01 (2007) (holding that a foreign sovereign is not immune from an action for declaratory relief regarding tax liens on the sovereign's real property, and stating that "property ownership is not an inherently sovereign function"); *Weltover*, 504 U.S. at 614 (holding that sovereign immunity does not apply "when a foreign government acts, not as a regulator of a market, but in the manner of a private player within that market").

The FSIA "governs the types of actions for which foreign sovereigns may be held liable in a court in the United States," *Verlinden*, 461 U.S. at 496-97, but it does not focus on international law claims. Rather, it "merely opens United States courts to plaintiffs with pre-existing claims against foreign states[.]" *Altmann*, 541 U.S. at 695; *see also id.* at 704 (Scalia, J., concurring) (noting that plaintiff's claims were based primarily in California law and explaining that "the FSIA affects substantive rights only accidentally, and not as a necessary and intended consequence of the law"). The FSIA treats claims arising under international law the same as claims arising under federal or state law, granting federal courts jurisdiction over foreign sovereigns in circumstances that meet the requirements of §§ 1605 to 1607, while granting immunity "in those cases involving alleged violations of international law that do not come within one of the FSIA's exceptions." *Amerada Hess*, 488 U.S. at 439, 443 (holding that federal courts lacked jurisdiction over a Liberian corporation's suit against Argentina for damage to an oil tanker during war between Great Britain and Argentina, because the FSIA was the sole source of jurisdiction over a foreign state, and it did not authorize jurisdiction in that case); *see also Saudi Arabia v. Nelson*, 507 U.S. 349, 361 (1993) (holding district court lacked jurisdiction over claims against Saudi Arabia for wrongful arrest, imprisonment, and torture because the "con-

duct boils down to abuse of the power of its police by the Saudi Government, and however monstrous such abuse undoubtedly may be, a foreign state's exercise of the power of its police has long been understood for purposes of the restrictive theory as peculiarly sovereign in nature").

In short, the FSIA established clear and comprehensive standards regarding the limited situations in which Congress deemed it appropriate to allow plaintiffs to sue foreign sovereigns in federal courts. Plaintiffs may bring such suits only in cases having a substantial connection to the United States and involving claims relating to a sovereign's private or commercial activities. The purpose of this comprehensive framework was to rectify the inconsistency and lack of uniformity that had previously beleaguered litigants. The Supreme Court has emphasized "the importance of developing a uniform body of law in this area," and that the FSIA's "standards control in the courts of the United States and of the States." *Verlinden*, 461 U.S. at 489 (internal quotation marks omitted).[5]

## II

Given Congress's intent to establish a uniform and consistent framework for jurisdiction over and litigation involving foreign sovereigns, and given that Congress chose not to include an exhaustion requirement in the FSIA, there appears to be little room for federal courts to impose a new, judge-made requirement on top of the statutory requirements already in the FSIA itself. "[F]ederal courts are vested with a virtually unflagging obligation to exercise the jurisdiction given them," *McCarthy v. Madigan*, 503 U.S. 140, 146 (1992) (internal quotation marks omitted), and courts have no authority to

---

[5]The Court has further explained that "Congress'[s] intention to enact a comprehensive statutory scheme is also supported by the inclusion in the FSIA of provisions for venue, 28 U.S.C. § 1391(f), removal, § 1441(d), and attachment and execution, §§ 1609-1611." *Amerada Hess*, 488 U.S. at 435 n.3.

devise an additional exhaustion requirement when a statute clearly sets out the prerequisites for federal jurisdiction, *see Darby v. Cisneros*, 509 U.S. 137, 138 (1993).

A

In imposing a judge-made exhaustion requirement on litigants in the FSIA context, the majority relies primarily on cases addressing exhaustion of administrative remedies. Maj. Op. at 12710-11 (citing *McCarthy*, 503 U.S. at 145; *Coit Independence Joint Venture v. FSLIC*, 489 U.S. 561, 579 (1989); *Patsy v. Bd. of Regents of Fla.*, 457 U.S. 496, 501 (1982); *McGee v. United States*, 402 U.S. 479, 483 n.6 (1971)). Because the reasoning in these cases is based on considerations of separation of powers, administrative efficiency and expertise, and other agency-related concerns, they provide little assistance in determining whether an exhaustion requirement should be imposed in the FSIA context. *See, e.g.*, *McCarthy*, 503 U.S. at 145 ("[T]he exhaustion doctrine recognizes the notion, grounded in deference to Congress'[s] delegation of authority to coordinate branches of Government, that agencies, not the courts, ought to have primary responsibility for the programs that Congress has charged them to administer."); *accord McGee*, 402 U.S. at 484 (noting that the task for courts in deciding the applicability of the administrative exhaustion requirement is "whether allowing all similarly situated registrants to bypass the administrative avenue in question would seriously impair [the agency's] ability to perform its functions") (internal quotation marks and modifications omitted).

To the extent it is appropriate to look to these cases for guidance, they do not support the majority's conclusion. Rather, they counsel exercising caution and considering carefully whether an exhaustion requirement is consistent with congressional intent. In both *McCarthy* and *Patsy*, the Supreme Court looked first for an indication that Congress intended to impose exhaustion requirements upon plaintiffs.

*See McCarthy*, 503 U.S. at 144 ("[A]ppropriate deference to Congress'[s] power to prescribe the basic procedural scheme under which a claim may be heard in a federal court requires fashioning of exhaustion principles in a manner consistent with congressional intent and any applicable statutory scheme."); *Patsy*, 457 U.S. at 501-02 ("[T]he initial question whether exhaustion is required should be answered by reference to congressional intent; and a court should not defer the exercise of jurisdiction under a federal statute unless it is consistent with that intent."). The Court has rarely discerned such an intent, and indeed has in general declined to require claimants to exhaust administrative remedies when it is not required by statute. *See, e.g.*, *Darby*, 509 U.S. at 138 (holding that courts may not impose a prudential exhaustion requirement on litigants under the Administrative Procedure Act when "neither the statute nor agency rules specifically mandate exhaustion as a prerequisite to judicial review."); *McCarthy*, 503 U.S. at 149 (holding that a prisoner was not required to exhaust the Bureau of Prisons' administrative procedure before making a *Bivens* claim for money damages); *Coit*, 489 U.S. at 565 (holding that creditors were not required to exhaust the Federal Home Loan Bank Board's administrative claims procedure before bringing suit against a federal bank); *Patsy*, 457 U.S. at 516 (holding that a plaintiff claiming discriminatory treatment was not required to exhaust state administrative remedies before bringing a § 1983 claim in federal court).[6]

---

[6]Only one of the cases cited by the majority held that a claimant must exhaust administrative remedies before initiating suit in federal court, and that case arose in the unique context of the federal Selective Service system. *McGee v. United States*, 402 U.S. at 485. Before requiring exhaustion, the Court undertook "a discrete analysis of the particular default in question, to see whether there is a governmental interest compelling enough to justify the forfeiting of judicial review." *Id.* (internal quotation marks omitted). In this context, the Court determined that a deliberate flouting of the administrative processes would undermine "the scheme of decisionmaking that Congress has created," and "jeopardize the interest in full administrative fact gathering and utilization of agency expertise." *Id.* at 484, 486; *see also McKart v. United States*, 395 U.S. 185, 195 (1969) ("In Selective Service cases, the exhaustion doctrine must be tailored to fit the peculiarities of the administrative system Congress has created.").

Nothing in these administrative law cases suggests that a court should require exhaustion in the FSIA context, where allowing plaintiffs immediate access to federal courts does not raise any risk of undermining the Congressional scheme. To the contrary, imposing an exhaustion requirement not contemplated by Congress is inconsistent with Congress's intent to have the FSIA's "comprehensive jurisdictional scheme" provide litigants with "clear guidelines" that were previously lacking. *Altmann*, 541 U.S. at 699, 700; *see also Darby*, 509 U.S. at 147 (refusing to impose additional exhaustion requirements under the APA, noting that doing so would "transform [the APA provision] from a provision designed to remove obstacles to judicial review of agency action into a trap for unwary litigants." (internal quotation marks omitted)). When Congress seeks to create such uniformity and clear standards for litigants, *see Verlinden*, 461 U.S. at 488, the administrative law cases cited by the majority counsel that we should defer to Congressional intent and decline to impose a new exhaustion requirement that will create a trap for unwary plaintiffs. *Cf. El Paso Natural Gas Co. v. Neztsosie*, 526 U.S. 473, 485-86 (1999) (holding that imposing a prudential exhaustion requirement was inappropriate where Atomic Energy Act gave district courts original jurisdiction over certain types of cases, and imposing such a requirement "would invite precisely the mischief . . . that the Act sought to avoid").

B

Nor is the majority's assertion that *Sarei* compels us to write an exhaustion requirement into the FSIA persuasive. Maj. Op. at 12715-16; *see Sarei v. Rio Tinto, PLC*, 550 F.3d 822 (9th Cir. 2008) (en banc) (plurality op.). First, the lead opinion in *Sarei*, which adopts the principle of prudential exhaustion for purposes of the Alien Tort Statute (ATS), is a plurality opinion that is not binding on subsequent panels. *See Nevius v. Sumner*, 105 F.3d 453, 460 n.6 (9th Cir. 1996).

Second, even as persuasive authority, *Sarei* is not on point. In *Sarei*, the plaintiffs (who were aliens) brought a lawsuit under the ATS charging a British corporation with violations of customary international law regarding matters of universal concern stemming from its operations in Papua New Guinea. *Sarei*, 550 F.3d at 825-26.[7] As noted by the plurality, this lawsuit had no nexus of any kind with the United States. *Id.* at 831. The *Sarei* plurality was concerned that the ATS gave courts potentially sweeping jurisdiction over civil tort actions raising customary international law claims that lacked any nexus to the United States. *Id.* In order to cabin this supposed limitless jurisdictional reach, the plurality adopted the Supreme Court's suggestion in *Sosa v. Alvarez-Machain*, 542 U.S. 692, 733 n.21 (2004), that federal courts consider adopting a prudential exhaustion requirement as a jurisdiction-limiting principle in the appropriate circumstances. *Sarei*, 550 F.3d at 824. *Sarei* held that prudential exhaustion is appropriate in cases "where the United States 'nexus' is weak" particularly "with respect to claims that do not involve matters of 'universal concern.' " *Id.* at 831.

The concerns expressed by the *Sarei* plurality are not at issue in the FSIA context. There is no analogous concern about unlimited jurisdiction due to the lack of a nexus with the United States: Unlike the ATS (in which courts must

---

[7]Specifically, the plaintiffs brought claims alleging:

(1) crimes against humanity resulting from the blockade; (2) war crimes for murder and torture; (3) violation of the rights to life, health, and security of the person resulting from the environmental damage; (4) racial discrimination in destroying villages and the environment, and in working conditions; (5) cruel, inhuman, and degrading treatment resulting from the blockade, environmental harm, and displacement; (6) violation of international environmental rights resulting from building and operating the mine; and (7) a consistent pattern of gross violations of human rights resulting from destruction of the environment, racial discrimination, and [Papua New Guinea] military activities.

Sarei, 550 F.3d at 825-26.

create jurisdiction-limiting principles), the FSIA does not give federal courts jurisdiction unless the claim has a nexus to the United States as required by § 1605. In enacting the FSIA, "Congress was aware of concern that our courts might be turned into small international courts of claims, open to all comers to litigate any dispute which any private party may have with a foreign state anywhere in the world." *Verlinden*, 461 U.S. at 490 (internal quotation marks and alteration omitted). The FSIA "protect[s] against this danger not by restricting the class of potential plaintiffs, but rather by enacting substantive provisions requiring some form of substantial contact with the United States." *Id.* (citing 28 U.S.C. § 1605).[8] Although the Supreme Court recognized that the implications of vast, unchecked federal jurisdiction under the ATS would be "breathtaking," *Sosa*, 542 U.S. at 736, these concerns are simply not present under the FSIA.

Moreover, the concern that jurisdictional overreaching under the ATS could have a negative effect on foreign relations, *see Sosa*, 542 U.S. at 727, are not present in the FSIA context. The FSIA's jurisdictional reach is consistent with that exercised by foreign nations over the United States. Indeed, the Supreme Court noted that Congress "join[ed] the majority of other countries by adopting the 'restrictive theory' of sovereign immunity[.]" *Permanent Mission of India*, 551 U.S. at 199; *see also Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 702 & n.15 (1976) (explaining that

---

[8]The Supreme Court has acknowledged that certain provisions of the FSIA do not (on their face) require a nexus to the United States. For example, the Court explained that "Section 1605(a)(1), which provides that sovereign immunity shall not apply if waived, may be seen as an exception to the normal pattern of the Act, which generally requires some form of contact with the United States." *Verlinden*, 461 U.S. at 491 n.15. In noting "[w]e need not decide whether, by waiving its immunity, a foreign state could consent to suit based on activities wholly unrelated to the United States," *id.*, the Court hinted that such a nexus might nevertheless be necessary in order for a federal court to have jurisdiction over a foreign sovereign under the FSIA.

the United States adopted the restrictive view in part based "on the fact that this approach has been accepted by a large and increasing number of foreign states in the international community," and listing countries). Further, the Supreme Court has recognized that "subjecting foreign governments to the rule of law in their commercial dealings presents a much smaller risk of affronting their sovereignty than would an attempt to pass on the legality of their governmental acts." *Id.* at 703-04. Here, Cassirer's case is a property dispute with Spain in its role as a private party, not as a sovereign exercising power over its own citizens.[9]

In sum, while the *Sarei* plurality strove to fill in both procedural and substantive gaps in the ATS to cabin its potentially unlimited jurisdiction and avoid impinging on relations with foreign sovereigns, *see Sosa*, 542 U.S. at 727, applying the FSIA's clear language does not require the same creative approach. In creating the FSIA's comprehensive and detailed scheme, Congress expressed its intent that foreign sovereigns meeting the statutory criteria be subject to suit in federal court, and did not invite us to read in anything more. *See* 28 U.S.C. § 1602 ("Claims of foreign states to immunity should henceforth be decided by courts of the United States and of the States *in conformity with the principles set forth in this chapter*." (emphasis added)); *Amerada Hess*, 488 U.S. at 434 (concluding that "the text and structure of the FSIA demonstrate Congress'[s] intention that the FSIA be the *sole basis* for obtaining jurisdiction over a foreign state in our courts" (emphasis added)).

---

[9]Contrary to the majority's assertion, Cassirer does not bring claims "based on non-domestic, international law," Maj. Op. at 12715 n.20, but rather brings state common-law claims of conversion. Indeed, allegations similar to those in Cassirer's complaint have been made, and adjudicated, in lawsuits between two private persons. *See, e.g.*, *DeWeerth v. Baldinger*, 836 F.2d 103 (2d Cir. 1987) (painting owner's heir brought conversion suit against good-faith purchaser for return of oil painting by Claude Monet, allegedly stolen during the Second World War).

### III

Nothing in the statutory language, history, or the Supreme Court's interpretation of the FSIA suggests that we should read an exhaustion requirement into the statute. Doing so will tend to defeat Congress's goal of achieving consistency and uniformity in suits against foreign sovereigns. The concerns addressed by the *Sarei* plurality are entirely distinguishable, and in any event, the plurality's decision to write an exhaustion requirement into the ATS is not binding on us. There is no need to create judge-made law in this context, and therefore, I would refrain from doing so. I respectfully dissent.